## ANGLE v. CHICAGO, ST. PAUL, MINNEAPOLIS AND OMAHA RAILWAY COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF WISCONSIN.

No. 73. Argued November 8, 9, 1893. — Decided January 3, 1894.

The United States granted lands to the State of Wisconsin, to aid in the construction of railroads. The State granted a portion of these lands to a company, called in the opinion of the court The Omaha Company, for the purpose of constructing a defined railroad. It also granted another portion of them to another company, called in the opinion of the court the Portage Company, for the purpose of constructing another and different, and to some extent competing railroad. The latter grant was conditioned upon the completion of the road by the grantee within a specified period. Work was begun upon the Portage road, but in 1873 the company became embarrassed, and then broke down. In 1878 the legislature of Wisconsin extended the time for the construction of the Portage Company's road three years. In 1881 a contract was made with A. for its completion, under which work was re med with vigor and was diligently prosecuted, with every prospect that the road would be completed within the extended time. In 1882, before the expiration of that extension, the legislature of that State passed an act revoking the grant to the Portage Company, and bestowing it upon the Omaha Company. As a result of this the work which A. was diligently performing under his contract was arrested; he was prevented through the direct and active efforts of the Omaha Company from completing his performance of it;

1.

the profits which he would have received from it were lost to him; and the land grant was wrested from the Portage Company. A. then commenced an action at law against the Portage Company, in which a judgment was recovered by his administratrix. Execution thereon being returned *nulla bona*, a bill in equity was filed in the Circuit Court of the United States by the administratrix against the Omaha Company, to reach the land grant in its hands. The bill charged that the Omaha Company had conspired with and bribed certain officials of the Portage Company, who, through circumstances named in the bill, had become sole stockholders in that company, to wrest the land grant from the Portage Company, and to prevent A. from completing his contract. It set forth sundry steps in the alleged conspiracy, and charged that the legislature of Wisconsin had been induced by the conspirators to pass the act forfeiting the land grant and bestowing it upon the Omaha Company. The defendant demurred and the demurrer was sustained by the Circuit Court. *Held:*

(1) That the demurrer admitted that A. had suffered the wrongs complained of in consequence of the interference of the Omaha Company;

(2) That it must be assumed, as conceded by the demurrer, that the officials of the Portage Company had been bribed by the Omaha Company to betray their trust, and that the legislature had been induced by false allegations to revoke the grant to the Portage Company and to bestow it upon the Omaha Company;

(3) That as the breaking down of the Portage Company and the ruin of its contractor was the natural and direct result of all this, the contractor could resort to equity to enforce against the land grant in the hands of the Omaha Company the judgment which he had obtained at law against the Portage Company;

(4) That it must be presumed that the legislature, in transferring the grant to the Omaha Company, did not intend to affect thereby the rights of the Portage Company against the Omaha Company in the courts;

(5) That as there was nothing in the words of the grant to the Omaha Company which expressly tied up the granted land, it passed to that company subject to seizure and sale in satisfaction of any of its obligations;

(6) That the Omaha Company, by reason of its conduct in this matter, became, as to the creditors of the Portage Company, a trustee *ex maleficio* in respect of this property.

If one maliciously interferes in a contract between two parties, and induces one of them to break that contract to the injury of the other, the party injured can maintain an action against the wrongdoer.

When a man does an act which in law and fact is a wrongful act, and injury to another results from it as a natural and probable consequence, an action on the case will lie.

A sole stockholder in a corporation cannot secure the transfer to himself of

all the property of the corporation so as to deprive a creditor of the corporation of the payment of his debt.

When an act of the legislature is challenged in a court, the inquiry by the court is limited to the question of power, and does not extend to the matter of expediency, to the motives of the legislators, or to the reasons which were spread before them to induce the passage of the act; and, on the other hand, as the courts will not interfere with the action of the legislature, so it may be presumed that the legislature never intends to interfere with the action of the courts, or to assume judicial functions to itself.

THIS was an appeal from a decree of the Circuit Court of the United States for the Western District of Wisconsin dismissing plaintiff's bill.

The bill was filed on the 23d of May, 1888, against the Chicago, Portage and Superior Railway Company, the Chicago, St. Paul, Minneapolis and Omaha Railway Company and the Farmers' Loan and Trust Company. The Chicago, St. Paul, Minneapolis and Omaha Railway Company was the only defendant served with process. It appeared, and, on the 28th of July, filed a demurrer to the bill which, after argument, was sustained, and on September 2, 1889, the decree of dismissal was entered. 39 Fed. Rep. 143 ; 39 Fed. Rep. 912.

The facts as stated in the bill were as follows : By two acts, of date June 3, 1856, and May 5, 1864, respectively, 11 Stat. 20, c. 43, and 13 Stat. 66, c. 80, Congress granted lands to the State of Wisconsin to aid in the construction of certain railroads, among others one "from a point on the St. Croix river or lake, between townships twenty-five and thirty-one, to the west end of Lake Superior, and from some point on the line of said railroad, to be selected by said State, to Bayfield." These land grants were accepted by an act of the legislature, approved October 8, 1856, (Laws Wisconsin, 1856, 137,) and by a joint resolution of the legislature of the State, of date March 20, 1865, (Gen. Laws Wisconsin, 1865, 689,) and a map of definite location was duly filed and accepted by the Secretary of the Interior.

By an act of March 4, 1874, (Laws Wisconsin, 1874, 186, c. 126,) the State granted to the North Wisconsin Railway Company, whose name was subsequently changed to Chicago,

St. Paul, Minneapolis and Omaha Railway Company, and which is the defendant herein, (to be hereafter called the Omaha Company,) that portion of the land grant applicable to the construction of the road from a point on St. Croix River to Bayfield, and to the Chicago and Northern Pacific Air-Line Railway Company, whose name was subsequently, and before 1878, changed to that of the Chicago, Portage and Superior Railway Company, (hereafter called the Portage Company,) so much of said grant as was applicable to the construction of the road from the west end of Lake Superior to a junction with the line running from St. Croix River to Bayfield.

The eighth section of this act, which is the granting section to the latter company, is as follows:

"There is hereby granted to the Chicago and Northern Pacific Air-line Railway Company all the right, title, and interest which the State of Wisconsin now has, or may hereafter acquire, in or to that portion of the lands granted to said State by said two acts of Congress as is or can be made applicable to the construction of that part of the railway of said company lying between the point of intersection of the branches of said grants, as fixed by the surveys and maps on file in the Land Office at Washington, and the west end of Lake Superior. This grant is made upon the express condition that said company shall construct, complete, and put in operation that part of its said railway above mentioned as soon as a railway shall be constructed and put in operation from the city of Hudson to said point of intersection, and within five years from its acceptance of said lands as herein provided, and shall also construct and put in operation the railway of said company from Genoa northerly, at the rate of twenty miles per year."

The value of the lands thus granted was, at the time of the wrongs hereinafter described, $4,000,000.

By section 12 the company was required within sixty days to file with the secretary of State an acceptance of the grant upon the terms and conditions named therein, and also such security for the construction of the road as should be required by the governor. Both of these conditions were complied with.

Genoa, named in section 8, was the town on the southern boundary of the State of Wisconsin, at which the line of the Chicago and Northern Pacific Air-line Railway entered the State, and Hudson was the place on the St. Croix River, described in the acts of Congress as the initial point of the road to be aided.

On March 16, 1878, an act was passed by the legislature of Wisconsin, (Laws Wisconsin, 1878, 442, c. 229,) extending the time for the construction of the Portage Company's road three years.

In the panic of 1873–74 the Portage Company had broken down, under a load of debts and embarrassments, and remained inactive until 1880. At that time it secured the services of Willis Gaylord to assist in extricating it from its embarrassments, and in continuing the construction of its road. William H. Schofield, an experienced railway projector and financier, was induced to accept the office of president, and the coöperation and assistance of the New York, New England and Western Investment Company (hereafter called the Investment Company) was secured.

A new mortgage for $25,000 a mile, and a new issue of stock, was provided for. Seven hundred thousand dollars of the new bonds and one million of the new stock were to be issued in full satisfaction of all outstanding stock, bonds, and other demands. In pursuance of these arrangements, it issued certificates of stock for one million dollars, in the name of A. A. Jackson, general solicitor of the Portage Company, which, endorsed by him in blank, were deposited with the Trust Company, and it also executed its orders to the number of ninety, calling for the delivery to John C. Barnes or bearer of a designated amount of said million dollars of stock in ten per cent instalments. These orders were in the following form:

"To the Farmers' Loan and Trust Company:

"This is to certify that, for value received, Mr. John C. Barnes or bearer is entitled to have and receive —— shares of the capital stock of the Chicago, Portage and Superior Rail-

way Company, which stock has been fully paid for and placed in your keeping as a special trust for delivery upon this order, and you are hereby authorized and directed to accept or certify in the usual manner this order for the delivery of said stock, and to deliver to the bearer hereof —— shares of the said stock whenever and as often as any two hundred and fifty thousand dollars of the first mortgage bonds of the said railway company are sold or disposed of by said railway company or by its fiscal agent, or whenever and as often as any ten miles of the railroad of said railway company shall be built, as will be certified to by the president of said railway company, and in any event you are hereby directed to deliver to the bearer, on the first day of January, A.D. 1883, any of the said —— shares of capital stock then remaining undelivered upon a surrender of this order therefor.

"CHICAGO, PORTAGE AND SUPERIOR
"RAILWAY COMPANY.

"[SEAL.]                    By —— ——, *President.*

[On the margin :] "This order for the delivery of the bonds and stock of this company held in special trust is hereby approved and accepted.

"THE FARMERS' LOAN AND TRUST COMPANY. [SEAL.]"

These orders were all delivered to John C. Barnes in exchange for and redemption of all the theretofore outstanding stock of the Portage Company, which stock was at once cancelled, with the exception of two certificates for $25,000, which, by oversight or design on the part of Charles J. Barnes, vice-president of the Portage Company, remained in his custody uncancelled.

The situation after these arrangements were made was such that the entire outstanding stock was in the possession and control of C. J. Barnes, J. C. Barnes, and A. A. Jackson, yet held by them in trust for the company. The further stock provided for was to be issued from time to time to assist in the sale of the bonds until enough of the latter had been disposed of to construct the road. These arrangements having

been perfected, the Portage Company, through its president, sought the alliance and support of the Grand Trunk Railway Company of Canada, which had recently completed an extension of its road to Chicago.

Three contracts were entered into, of dates June 16, 1881, July 10, 1881, and September 30, 1881, by which the bonds of the company were to be disposed of and money enough advanced for the construction of the road. The bill sets out fully the nature and scope of these contracts, and copies of them are attached as exhibits. It is unnecessary here to say more than that, by them, taken in connection with the prior arrangements of the Portage Company, the latter obtained satisfactory assurances of abundant funds, and was placed in a position to fully perform its agreement with the State and construct the railroad by at least May 5, 1882 — all this, of course, upon the condition of no outside and wrongful interference.

Relying upon the sufficiency of its arrangements for money, it, on August 18, 1881, entered into a contract with Horatio G. Angle for the construction of about sixty-five miles of its railway, being that portion covered by the land grant heretofore referred to. By the terms of that contract Angle was to receive $8500 per mile in cash and $5000 per mile in the full-paid stock of the company, on condition that he completed the road on or before May 5, 1882. It also contracted for steel rails and fastenings to be delivered as the work of construction proceeded.

Angle commenced work, and had made such progress that, on the 20th of January, 1882, he had 1600 men employed along the line, and it was an assured fact that, unless interfered with, he would complete the railway, according to the terms of the contract, on or before May 5, 1882.

The bill further charges that about this time the Omaha Company conspired with other parties to wrest from the Portage Company its land grant, and to that end to prevent the completion of the contract by Angle and the construction of the road.

In the carrying out of this conspiracy, the conspirators

bribed Charles J. Barnes and A. A. Jackson, officers of the Portage Company, and who, either personally or as attorneys in fact for John C. Barnes, had the control of all the outstanding stock of the Portage Company, though holding it in trust for the benefit of the company, to betray their trust and transfer the stock to one L. J. Gage, for the benefit of the Omaha Company.

Having thus secured the control of the stock, they caused notice thereof to be given to the officers of the Grand Trunk Railway Company. These gentlemen, finding that the control of the Portage Company was passing into the hands of hostile interests, surrendered the collateral which had already been transferred. to them, and declined to proceed further in the contracts which had been entered into.

Continuing the execution of this conspiracy, the Omaha Company notified the general manager of the Portage Company of the purchase of the outstanding stock, and advised and induced him to telegraph officially to the engineer-in-chief in charge of the work of construction, who had engaged in that work seven engineering corps, to forthwith call in these engineers, suspend their work, and pay them off. They also caused the general manager to notify the contractor, Angle, that the control of the company had been changed, and the English capitalists forced out, and also to telegraph to the merchants at Duluth and Superior City (who were furnishing supplies to the 1600 men at work) that the company had been sold out, advising them to protect themselves, because the company could not pay or protect them.

In consequence of these notices, the several engineering corps were broken up, the engineers left the work, all the tools, material, and other personal property belonging to the contractor and the company were attached at the suit of these merchant creditors, and the 1600 laborers dispersed and went elsewhere for work.

In further execution of this conspiracy it endeavored to bribe the president and directors of the Portage Company and the Investment Company to turn over the organization of the Portage Company at once to them. Failing in this, it caused

a bill to be filed in the Circuit Court for Cook County, Illinois, falsely charging the president and board of directors with incurring imprudent obligations and otherwise thus impairing the value of the million and twenty-five thousand of stock, purchased as heretofore set forth, and praying for a temporary injunction which, on February 11, 1882, was granted without hearing or notice, and restrained the president and other officers of the Portage Company from doing any act or thing whatsoever in the name or behalf of the company during the continuance of the injunction.

In still further execution of the conspiracy, the Omaha Company caused the fact of the abandonment of the work and the dispersion of the laborers engaged thereon to be promptly and widely published throughout Wisconsin, and especially among the members of the legislature, then in session at Madison — concealing at the same time the means by which this had been accomplished.

Further, through its own agents, and especially through Jackson and Barnes, the corrupted officers of the Portage Company, it falsely represented to the legislature that no special progress had been made in the matter of constructing this road; that no considerable number of men had ever been at work, and that the Portage Company had finally abandoned it, and was wholly without means or credit to prosecute it.

On the strength of these representations the legislature, without inquiry or hearing, on February 16, 1882, (Laws Wisconsin, 1882, p. 11, c. 9,) hurriedly passed an act forfeiting and revoking the grant to the Portage Company and bestowing it upon the Omaha Company, which forfeiture and re-granting were confirmed by an act passed March 5, 1883. Laws of 1883, 19, c. 29.

The contract with Angle having been thus broken by the Portage Company he commenced an action at law against that company. While this action was pending Angle died, but a revivor was had in the name of the present plaintiff, and on January 31, 1887, she recovered a judgment in the Circuit Court of the United States for the Western District of Wisconsin for $205,803.19.

Upon that judgment execution was issued and returned *nulla bona*, and thereupon this bill was filed to reach the land grant in the hands of the Omaha Company.

*Mr. J. R. Doolittle* and *Mr. Thomas Ewing* for appellant. *Mr. Milton I. Southard* was with *Mr. Ewing* on his brief.

*Mr. John F. Dillon* and *Mr. Thomas Wilson,* for appellee.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

That which attracts notice on even a casual reading of the bill — the truth of all the allegations in which must be taken, upon this record, to be admitted by the demurrer — is the fact that, while Angle was actively engaged in executing a contract which he had with the Portage Company — a contract whose execution had proceeded so far that its successful completion within the time necessary to secure to the Portage Company its land grant was assured, and when neither he nor the Portage Company was moving or had any disposition to break that contract or stop the work — through the direct and active efforts of the Omaha Company the performance of that contract was prevented, the profits which Angle would have received from a completion of the contract were lost to him, and the land grant to the Portage Company was wrested from it.

Surely it would seem that the recital of these facts would carry with it an assurance that there was some remedy which the law would give to Angle and the Portage Company for the losses they had sustained, and that such remedy would reach to the party, the Omaha Company, by whose acts these losses were caused.

That there were both wrong and loss is beyond doubt. And, as said by Croke, J., in *Baily* v. *Merrell*, 3 Bulst. 94, 95, "damage without fraud gives no cause of action; but where these two do concur and meet together, there an action lieth."

The Portage Company held a land grant worth four millions of dollars.  It had contracted for the construction of its road, such construction to be completed in time to perfect its title to the land.  The contract had been so far executed that its full completion within the time prescribed was assured.  The contractor had sixteen hundred men employed.  The rails had been purchased.  The company had lifted itself out of the embarrassments which years before had surrounded it.  It had taken up all its old stock but $25,000, which was ignorantly or wrongfully withheld by one of its officers.  It had issued one million of new stock, had authorized a new issue of bonds, and had arranged for the cancelling of all its obligations with seven hundred thousand of these bonds and one million of stock.  It had consummated arrangements with a wealthy company for the advancement of moneys sufficient for its work, and had gone so far as to place in the hands of that company one hundred thousand of its bonds, upon which $50,000 in cash was to be advanced.  Except through some wrongful interference, it was reasonably certain that everything would be carried out as thus planned and arranged.

At this time the Omaha Company, which was a rival in some respects, and which had located a line parallel and contiguous to the line of the Portage Company, interferes, and interferes in a wrongful way.  It bribes the trusted officers of the Portage Company to transfer the entire outstanding stock into its hands, or at least place it under its control.  Being thus the only stockholder, it induces the general manager to withdraw the several engineering corps, whose presence was necessary for the successful carrying on of the work of constructing the road; to give such notice as to result in the seizure of all the tools and supplies of the contractor and the company, and the dispersion of all laborers employed.  To prevent any action by the faithful officers of the Portage Company, it wrongfully obtains an injunction tying their hands.  In the face of this changed condition of affairs the company, which had negotiated with the Portage Company and was ready to advance it money, surrendered the one hundred thousand of the bonds, and abandoned the arrange-

ment. By false representations to the legislature as to the facts of the case, it persuaded that body to revoke the grant to the Portage Company and bestow the lands upon itself.

That this was a wrongful interference on the part of the Omaha Company, and that it resulted directly in loss to the contractor and to the Portage Company, is apparent. It is not an answer to say that there was no certainty that the contractor would have completed his contract, and so earned these lands for the Portage Company. If such a defence were tolerated, it would always be an answer in case of any wrongful interference with the performance of a contract, for there is always that lack of certainty. It is enough that there should be, as there was here, a reasonable assurance, considering all the surroundings, that the contract would be performed in the manner and within the time stipulated, and so performed as to secure the land to the company.

It certainly does not lie in the mouth of a wrongdoer, in the face of such probabilities as attend this case, to say that perhaps the contract would not have been completed even if no interference had been had, and that, therefore, there being no certainty of the loss, there is no liability.

Neither can it be said that the Omaha Company had a right to contend for these lands; that it simply made an effort, which any one might make, to obtain the benefit of this land grant. No rights of this kind, whatever may be their extent, justify such wrongs as were perpetrated by the Omaha Company. Here, bribery was resorted to to induce the trusted officers of the Portage Company to betray their trust, and to place at least the apparent ownership of the stock in the hands of the rival company.

Without notice, without hearing, and by false allegations, it secured an injunction to stay the hands of the honest officers of the Portage Company. Such wrongful use of the powers and processes of the court cannot be recognized as among the legitimate means of contest and competition. It burdens the whole conduct of the Omaha Company with the curse of wrongdoing, and makes its interference with the affairs of the Portage Company a wrongful interference.

Further, by false representations as to what the Portage Company has done and intends to do, it induced the legislature of the State to revoke the grant to the Portage Company and bestow it upon itself. The result, and the natural result, of these wrongful actions on the part of the Omaha Company was the breaking down of the Portage Company, the disabling it from securing the means of carrying on this work, the dispersion of the laborers, and the prevention of the contractor from completing his contract. It will not do to say that the contractor was not bound to quit the work, but might have gone on and completed his contract, and thus earned the lands for the Portage Company; nor that the wrongful act of the trusted officers of the Portage Company in betraying their trust could have been corrected by the Portage Company by appropriate suit in the courts; that the law in one shape or another would have offered redress to the Portage Company for all the wrongs that were attempted and done by the Omaha Company. Granting all of this, yet the fact remains that the natural, the intended, result of these wrongful acts was the breaking down of the Portage Company, the unwillingness of the foreign company to furnish it with money, and the prevention of the contractor from completing his contract.

It is not enough to say that other remedies might have existed and been resorted to by the Portage Company, and that notwithstanding the hands of its officers were tied by this wrongful injunction. It is enough that the Portage Company did break down; that it broke down in consequence of these wrongful acts of the Omaha Company, and that they were resorted to by the latter with the intention of breaking it down.

It has been repeatedly held that, if one maliciously interferes in a contract between two parties, and induces one of them to break that contract to the injury of the other, the party injured can maintain an action against the wrongdoer: *Green* v. *Button,* 2 Cr. Mees. & R. 707, in which the defendant, by falsely pretending to one party to a contract that he had a lien upon certain property, prevented such party from delivering it to the plaintiff, the other party to the contract, and was

held responsible for the loss occasioned thereby. *Lumley* v. *Gye*, 2 El. & Bl. 216, in which a singer had entered into a contract to sing only at the theatre of the plaintiff, and the defendant maliciously induced her to break that contract, and was held liable to the damages sustained by the plaintiff in consequence thereof. *Bowen* v. *Hall*, 6 Q. B. D. 333, 337, in which it was held that an action lies against a third person who maliciously induces another to break his contract of exclusive personal service with an employer, which thereby would naturally cause, and did in fact cause, an injury to such employer. In the opinion of Brett, L. J., it was said "that wherever a man does an act which in law and in fact is a wrongful act, and such an act as may, as a natural and probable consequence of it, produce injury to another, and which in the particular case does produce such an injury, an action on the case will lie. This is the proposition to be deduced from the case of *Ashby* v. *White*. If these conditions are satisfied, the action does not the less lie because the natural and probable consequence of the act complained of is an act done by a third person; or because such act so done by the third person is a breach of duty or contract by him, or an act illegal on his part, or an act otherwise imposing an actionable liability on him." *Walker* v. *Cronin*, 107 Mass. 555, in which a manufacturer was held entitled to maintain an action against a third party who, with the unlawful purpose of preventing him from carrying on his business, wilfully induced many of his employés to leave his employment, whereby the manufacturer lost their services, and the profits and advantages which he would have derived therefrom. *Benton* v. *Pratt*, 2 Wend. 385. *Rice* v. *Manley*, 66 N. Y. 82, in which a party had contracted to sell and deliver to plaintiffs a quantity of cheese, but having been made to believe through the fraud of the defendant that the plaintiffs did not want the cheese, sold and delivered it to him, and it was held that an action could be maintained against the defendant for the damages which the plaintiffs sustained from failing to get the cheese. *Jones* v. *Stanly*, 76 N. C. 355, 356, in which the court said: "It was decided in *Haskins* v. *Royster*, 70 N. C. 601, that if a person

maliciously entices laborers or croppers to break their contracts with their employer and desert his service, the employer may recover damages against such person. The same reasons cover every case where one person maliciously persuades another to break *any* contract with a third person. It is not confined to contracts for service."

Under these authorities, if the Omaha Company had by its wrongful conduct simply induced the Portage Company to break its contract with Angle, it would have been liable to him for the damages sustained thereby. *A fortiori*, when it not only induces a breach of the contract by the Portage Company, but also disables it from performance.

But there is still another aspect in which these transactions may be regarded. The Omaha Company became by its wrongful acts the sole stockholder in the Portage Company. It matters not that it might have been dispossessed of this position by appropriate action in the courts. It was, for the time at least, the sole stockholder.) As such sole stockholder, it took advantage of its position and its power to strip the Portage Company of its property and secure its transfer to itself.

Now, what rights, if any, a corporation may have against a sole stockholder who wrongfully causes the transfer of all the property of the corporation to be made to himself, need not be inquired into. It is clear that this stockholder cannot secure this transfer from the corporation to itself of the property of the latter so as to deprive a creditor of the corporation of the payment of his debt.

To put it in another way: The Portage Company, a corporation, owed Angle $200,000. It had property with which that debt could be paid. The Omaha Company became the sole stockholder in the Portage Company. As such sole stockholder, it used its powers to transfer the property of the Portage Company to itself, and its conduct all the way through was marked by wrongdoing.

Whatever the Portage Company might do, Angle may rightfully hold the sole stockholder responsible for that payment, which the corporation would have made but for the wrongful acts of such stockholder.

But the stress of the defendant's contention is not that the bill fails to state a case of wrong for which, generally speaking, the law would give a remedy, but that the action of the legislature of the State in revoking the land grant to the Portage Company and donating it to the Omaha Company is conclusive upon the courts, and prevents any recovery; and, secondly, that although actionable wrong on the part of the defendant may be disclosed by the bill, the only remedy which the plaintiff has therefor is an action at law for damages, and no grounds are shown for the interposition of a court of equity.

With respect to the first of these matters, it is insisted that the Portage Company was in default at the very time that these wrongs, on the part of the Omaha Company, were charged to have been committed and the act of forfeiture was passed. By section 8 (the granting section) of the act of March 4, 1874, it was provided: "This grant is made upon the express condition that said company shall construct, complete, and put in operation that part of its said railway above mentioned, as soon as a railway shall be constructed and put in operation from the city of Hudson to said point of intersection, and within five' years from its acceptance of said lands as herein provided, and shall also construct and put in operation the railway of said company from Genoa northerly, at the rate of twenty miles per year." The act of March 16, 1878, reads that " the time limited for the construction of the railway . . . is hereby extended three years." It is said that this act in effect merely struck out the word "five" in the clause quoted, and substituted therefor the word "eight," leaving the other conditions of the grant unchanged. It is not claimed in the bill that the Portage Company had ever constructed any part of its road from Genoa northward, or that a railway had not been constructed and put in operation from the city of Hudson to the point of intersection, and, therefore, it is urged that it is not shown that the Portage Company was not in default or that the legislature had not the absolute right to forfeit, as it did, by the act of February 16, 1882. It is contended, on the other hand, by the plaintiff that the ex-

tension was an absolute extension of three years from May 5, 1879, irrespective of the other two conditions in the original grant, and gave to the Portage Company an interest in the land grant which the legislature had no power to take away before May 5, 1882. It is further insisted by the defendant that, even if this claim of the plaintiff be sustained, the act of March 5, 1883, confirming the revocation and resumption of the land grant to the Portage Company, and the regranting of the same to the Omaha Company, was after the expiration of the full limit of extended time as thus claimed by the plaintiff, and that then the Portage Company had unquestionably failed to earn the grant and had lost all right to the land. Hence, it is said that there was, in whatever aspect the matter may be looked at, a valid resumption by the State of the grant which it had made conditionally to the Portage Company and a regrant of the lands to the Omaha Company; that the act of the legislature cannot be questioned; that full knowledge of all the situation must be presumed, and that no inquiry is permissible as to the motives which actuated the legislature, it being presumed that everything which it did it did rightly.

In this respect, the case of *Fletcher* v. *Peck*, 6 Cranch, 87, 130, is relied upon. In that case a purchase of a large body of lands was made by James Gunn and others in the year 1795, from the State of Georgia, the contract for which was made in the form of a bill passed by the legislature. The title to some of these lands thus acquired passed by conveyances to Peck, who conveyed them to Fletcher. An action was brought on certain covenants in that deed. The third covenant was that all the title which the State of Georgia ever had in the premises had been legally conveyed to Peck, the grantor. The second count assigned, as a breach of this covenant, that the original grantees from the State of Georgia promised and assured divers members of the legislature, then sitting in general assembly, that if the said members would assent to, and vote for the passing of the act, and if the said bill should pass, such members should have a share of, and be interested in all the lands purchased from the said

State by virtue of such law. And that divers of the said members, to whom the said promises were made, were unduly influenced thereby, and, under such influence, did vote for the passing of the said bill; by reason whereof the said law was a nullity, etc., and so the title of the State of Georgia did not pass to the said Peck. In respect to this matter the court, by Chief Justice Marshall, observed, among other things, as follows:

"This is not a bill brought by the State of Georgia to annul the contract, nor does it appear to the court by this count that the State of Georgia is dissatisfied with the sale that has been made. The case, as made out in the pleadings, is simply this: One individual who holds lands in the State of Georgia, under a deed covenanting that the title of Georgia was in the grantor, brings an action of covenant upon this deed, and assigns, as a breach, that some of the members of the legislature were induced to vote in favor of the law, which constituted the contract, by being promised an interest in it, and that therefore the act is a mere nullity.

"This solemn question cannot be brought thus collaterally and incidentally before the court. It would be indecent in the extreme, upon a private contract between two individuals, to enter into an inquiry respecting the corruption of the sovereign power of a State. If the title be plainly deduced from a legislative act, which the legislature might constitutionally pass, if the act be clothed with all the requisite forms of a law, a court, sitting as a court of law, cannot sustain a suit brought by one individual against another founded on the allegation that the act is a nullity in consequence of the impure motives which influenced certain members of the legislature which passed the law."

The rule upon which this decision rests has been followed in many cases and has become a settled rule of our jurisprudence. The rule, briefly stated, is that whenever an act of the legislature is challenged in court the inquiry is limited to the question of power, and does not extend to the matter of expediency, the motives of the legislators, or the reasons which were spread before them to induce the passage of the act.

This principle rests upon the independence of the legislature as one of the coördinate departments of the government. It would not be seemly for either of the three departments to be instituting an inquiry as to whether another acted wisely, intelligently, or corruptly. Upon that rule it is insisted that these two acts of the State of Wisconsin cannot be impeached; that whatever wrongs may in fact have been done by the Omaha to the Portage Company, the legislature of Wisconsin, in the exercise of its undoubted power, has taken away the lands from the Portage and given them to the Omaha Company, and, as its power is undoubted, no court can interfere or inquire as to why or under the influence of what motives or information those acts were passed; nor can any court decree, either directly or indirectly, that those lands which were taken away from one company and given to the other, either legally or equitably, still remain the property of the first company, and subject to the payment of its debts.

But it must be remembered that the wrongs of the Omaha Company were done before the legislature passed either the act of 1882 or that of 1883, and it is to redress those wrongs that this suit was brought. Can it be that the legislature, by passing those acts, condoned the wrongs, and relieved the Omaha from any liability to the Portage Company? Did the resumption of the land grant and the regrant to the Omaha Company make lawful its acts in bribing the officers of the Portage Company? Did it relieve the Omaha Company from any liability for the wrongful use of the process of the courts in the injunction? Could it act judicially and in effect decree that the wrongs done by the one company to the other created no cause of action? A right of action to recover damages for an injury is property, and has a legislature the power to destroy such property? An executive may pardon and thus relieve a wrongdoer from the punishment the public exacts for the wrong, but neither executive nor legislature can pardon a private wrong or relieve the wrongdoer from civil liability to the individual he has wronged. The wrong was not one done by the State or in the act of the legislature in taking away the land grant, but in such proceed-

ings on the part of the Omaha Company as put the Portage Company in a position which apparently called for the action of the legislature. There is no more challenge of the validity of this legislation by suing the Omaha Company for the wrongs it did leading up to this legislation than there is in challenging the validity of a criminal proceeding by an action against the prosecutor for malicious prosecution. It may be, as counsel claim, that the legislature is presumed to act with full knowledge of the situation; that it knew of the wrongs done by the Omaha to the Portage Company; knew that those wrongs had disabled the Portage Company from proceeding with the work; knew that thereby a cause of action had arisen to the contractor, Angle, against the Portage Company, and also against the Omaha Company; and with all that knowledge in possession deliberately passed the statutes referred to, and yet it does not follow that its legislation was intended or was potent to relieve the Omaha Company from liability. There is in this suggestion no impugning the motives, the wisdom, or the power, of the legislature. It acts as the guardian of the public interests, to which all private interests must yield, and it may well have thought that, notwithstanding the wrong that had been done by the Omaha Company, the fact was obvious that the Portage Company had become disabled, and could not go on with the work; and that in subserviency to such public interest it was necessary that the grant be taken away from the former and given to the latter company, in order thus to expedite the construction. As the courts will not interfere with the action of the legislature, so it may rightfully be presumed that the legislature never intends to interfere with the action of the courts, or to assume judicial functions to itself. It may be presumed to have left to the courts the redress of the private wrongs done by the Omaha Company. In other words, it may have acted upon considerations like these : Public interest requires the speedy building of this road; the Portage Company cannot build it, the Omaha Company can if aided by this grant; therefore, the public interests demand a taking away of the grant from the one company and giving it to the

other. If the disabled condition of the Portage Company has been brought about by the wrongs of the Omaha Company, the courts are open, and the accepted maxim in those tribunals is, that where there is a wrong there is a remedy. It thus subserves the interests of the public and leaves the redress of the wrong to that department which has not only the requisite jurisdiction, but also the appropriate machinery for ascertaining the amount of the injury, and enforcing the due compensation.

Look at this from the opposite standpoint: When this matter was brought to the attention of the legislature, and its action invoked, was it confronted with only these alternatives? Must it, even if it could, as a condition of subserving the public interests, condone the private wrong done by the one company to the other, or must it let the public interests be neglected until such time as the question of private wrong has been determined, or must it, without the possession of the suitable machinery for investigation, arbitrarily determine — as a condition of this transfer in subservience to public interests — the measure of injury done by the one company to the other, and the amount and character of the compensation to be rendered? Large and unnecessary stress would be laid upon the legislature if the question of public interest was always to be thus hampered by suggestions of injury and compensation between private individuals. While if there be no such stress, abundant freedom of action is open to the legislature, the distinction between the separate functions of the coördinate departments of the government is preserved, and at the same time public interest and private justice may be secured. The legislature may proceed with sole regard in all its actions to the public interests, with the assurance that all questions of wrong and loss between individuals will be settled in the judicial department, and that its own action in subserviency to the public interest will bar no redress of a private wrong unless such bar be absolutely necessary to the accomplishment of the public interest.

But it is said that to permit this suit to be maintained, and to subject these lands in the possession of the Omaha Com-

pany to the satisfaction of the judgment against the Portage Company, is, *pro tanto*, to nullify the action of the legislature; that in taking the lands away from the one company and giving them to the other, it intended that the transfer should be absolute, without limitation, and subject to no contingencies or burdens. But it affirmatively expressed no such intention; it simply made the transfer, leaving the property subject to all the burdens and contingencies which might arise in the ordinary course of law. Suppose at the time of this transfer from the one company to the State, and from the State to the other company, there was an existing judgment in favor of the Portage against the Omaha Company, would it be for a moment contended that there was anything in the transfer which prevented the Portage Company from satisfying its judgment by a seizure and sale of the lands thus transferred to the Omaha Company? Unless there were in the words of the grant to the Omaha Company something which expressly tied up that land, it passed to the company, subject to seizure and sale in satisfaction of any of its past or future obligations.

Even if it be conceded that, under a true construction of the grant, taken in connection with the act extending the time for three years, the Portage Company was in default on February 16, 1882, and the legislature had then the absolute right to forfeit the grant, such concession would be no answer to the cause of action set out in the bill. For who can say that the legislature would have exercised that right of forfeiture? The mere fact that the Portage Company could not enforce at the time a legal right to the lands as against the State does not absolve the Omaha Company from liability for those w ongs which resulted in putting the Portage Company in a con lition naturally calling for legislative action in furtherance c f the public interest. If nothing of the kind had been done by the Omaha Company, and the Portage Company was, as it is stated, proceeding diligently in the work, with reasonable assurance that it would be completed within three or four months, it is fair to presume that the legislature would not have disturbed the grant, but would have permitted the Portage Company to fully earn that which it had already partially

earned. The selection of the Portage Company in the first instance was, of course, made by the legislature in good faith, and the time was extended with the intent that the Portage Company should do the work and have the grant, and if the legislature saw that the company was doing the work and would have it promptly completed, respect for the good faith of the legislature compels the conclusion that but for the untoward circumstances precipitated upon the Portage Company by the wrongful acts of the Omaha Company the act of February 16, 1882, would never have been passed. Assuredly it does not lie in the power of the wrongdoer, the party whose wrongs created that condition which induced the legislative forfeiture, to excuse its wrongs on the ground that the legislature had the power to forfeit, and might have done it anyway. The cases of *Benton* v. *Pratt*, 2 Wend. 385, 390, and *Rice* v. *Manley*, 66 N. Y. 82, 85, are suggestive upon this question. In the former of these cases it appeared that certain parties had contracted with the plaintiff to purchase of him twenty hogs, to be delivered at a future day, nothing having been done to make the contract binding under the statute of frauds. While the plaintiff was driving his hogs and preparing to fulfil his contract, the defendants, knowing the facts, fraudulently represented that he did not intend to deliver them, and thus induced those third parties to buy their hogs, and when the plaintiff arrived with his they refused to take them simply because they had already a full supply. The point was made that the plaintiff could not recover because there was no binding contract between him and the third parties, but the point was overruled, the court saying: "It was not material whether the contract of the plaintiff with Seagraves & Wilson was binding upon them or not, the evidence established beyond all question that they would have fulfilled it but for the false and fraudulent representations of the defendants." And in the latter case the plaintiffs had made an agreement with one Stebbins to purchase from him a quantity of cheese, to be delivered at a future day, and that contract, too, was not binding by reason of the statute of frauds. The defendant knowing of this, fraudulently, by means of a fictitious tele-

gram, persuaded Stebbins that the plaintiffs did not want the cheese and would not take it, and thus himself secured a purchase of it. Here, too, it was objected, in defence to an action against him for the damages caused by a failure on the part of the plaintiffs to obtain the cheese from Stebbins, that there was no contract which could be enforced against Stebbins for the sale and delivery of the cheese, but the court overruled the objection, saying: "Plaintiffs' actual damage is certainly as great as it would have been if Stebbins had been obliged to perform his contract of sale, and greater, for the reason that they cannot indemnify themselves for their loss by a suit against Stebbins to recover damages for a breach of the contract. Suppose a testator designed to give A a legacy, and was prevented from doing it solely by the fraud of·B; in such case, while A has no right to the legacy which he can enforce against the estate of the testator, yet both law and equity will furnish him appropriate relief against B, depending upon the facts of the case. (Kerr on Frauds, 274, and cases cited; Bacon Ab. Fraud, B.) Suppose A made a parol contract with B for the purchase of land, and B is ready and willing to convey, but is prevented from so doing by the fraudulent representations of C as to A, by which B is deceived and induced to convey to C; in such case, although A could not have compelled B to give him the conveyance, it would be a reproach to the law to hold that C would not be liable to A for the damage caused by the fraud." The same line of thought applies to the case before us. While it cannot be affirmed with certainty that the legislature would not have passed the act of forfeiture, yet it is reasonable to presume that it would not, and that its act was induced by the situation of the Portage Company, which situation was brought about by the wrongful acts of the Omaha Company.

Our conclusions in respect to this matter may be summed up thus: The Portage Company would have completed the work but for the wrongful acts of the Omaha Company. In consequence of the disability thus caused, and also moved by the false representations of the Omaha Company, the legislature resumed its grant and made a regrant to the Omaha

Company.  The validity of that act is conceded.  It is to be presumed the legislature acted with proper regard to the public interests, and without any improper motives or inducements.  Conceding all this, it is equally to be presumed that it left the redress of private wrongs to the judicial department.  It attached no conditions to the grant to the Omaha Company which would prevent the appropriation of those lands to the satisfaction of any claims against that company.  And hence to hold the Omaha Company as trustee for the creditors of the Portage Company, in respect to these lands, neither impeaches the validity of the action of the legislature nor casts any imputation upon its knowledge or motives.  It may also be noticed that the purpose of this grant, from Congress in the first place and from the State to the companies in the second place, was to aid in the construction of the railroad.  That purpose having already been accomplished, there is no thwarting public policy, or the purposes of the grant, if the lands granted shall now be appropriated, through the processes of the courts, to the satisfaction of any claims against the Omaha Company.

Passing now to the other of the two objections, it may be conceded that an action at law would lie for the damages sustained by the Portage Company, through the wrongful acts of the Omaha Company.  Indeed, that is a fact which underlies this whole case.  Yet, while an action at law would lie, it does not follow that such remedy was either full or adequate.  Waiving the question as to the solvency of the Omaha Company, and assuming that any judgment against it for damages could be fully satisfied by legal process, there remains the proposition that it is contrary to equity that the defendant should be permitted to enjoy unmolested that particular property, the possession of which it sought to secure, and did in fact secure, by its wrongful acts.  Ought the Portage Company to be compelled to experiment with the solvency of the Omaha Company before coming into a court of equity?  While no express trust attached to the title to these lands, either in the Portage or in the Omaha Company, — while it may be conceded that when the legislature resumed

the grant it took the title discharged of any express trust or
liability in favor of the creditors of the Portage Company,
and might have transferred an absolute title to any third
party beyond the reach or pursuit of the Portage Company,
or its creditors, — yet it is still true that the lands were given
to the Portage Company, as they had been given by Congress
to the State in the first instance for the purpose of aiding in
the construction of this road; that a part of the work neces-
sary for such construction had been done, and there is, there-
fore, an equity in securing, to the extent to which the work
had been done, the application of these lands in payment
thereof.  And when the Omaha Company, by its wrong-
doings, secured the full legal title to those lands, equity will
hold that the party who has been deprived of payment for
his work from the Portage Company, by reason of their
having been taken away from it, shall be able to pursue those
lands into the hands of the wrongdoer, and hold them for the
payment of that claim which, but for the wrongdoings of the
Omaha Company, would have been paid by the Portage Com-
pany, partially at least, out of their proceeds.  While no
express trust is affirmed as to the lands, yet it is familiar
doctrine that a party who acquires title to property wrong-
fully may be adjudged a trustee *ex maleficio* in respect to that
property.

In Pomeroy Eq. Jur. § 155, the author says, citing many
cases: "If one party obtains the legal title to property, not
only by fraud or by violation of confidence or of fiduciary
relations, but in any other unconscientious manner, so that he
cannot equitably retain the property which really belongs to
another, equity carries out its theory of a double ownership,
equitable and legal, by impressing a constructive trust upon
the property in favor of the one who is in good conscience
entitled to it, and who is considered in equity as the beneficial
owner."  And again, in section 1053: "In general, whenever
the legal title to property, real or personal, has been obtained
through actual fraud, misrepresentations, concealments, or
through undue influence, duress, taking advantage of one's
weakness or necessities, or through any other similar means or

under any other similar circumstances which render it uncon-scientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same, although he may never per-haps have had any legal estate therein ; and a court of equity has jurisdiction to reach the property either in the hands of the original wrongdoer, or in the hands of any subsequent holder, until a purchaser of it in good faith and without notice acquires a higher right, and takes the property relieved from the trust. The forms and varieties of these trusts, which are termed *ex maleficio* or *ex delicto*, are practically without limit. The principle is applied wherever it is necessary for the obtaining of complete justice, although the law may also give the remedy of damages against the wrongdoer."

These authorities are ample to sustain this suit. The property was in the Portage Company for the purpose of aid-ing in the construction of this road ; work was done by the plaintiff in that direction. Equity recognizes a right that that property should be applied in the payment for that work. The wrongdoing of the defendant, the Omaha Company, has wrested the title to this property from the Portage Company and transferred it to itself. It has become, therefore, a trustee *ex maleficio* in respect to the property. It follows from these considerations that the court erred in sustaining the demurrer to this bill, and the decree of dismissal must be

> *Reversed, and the case remanded with instructions to over-rule the demurrer, and for further proceedings in con-formity to law.*

MR. JUSTICE HARLAN dissented from the opinion and judg-ment for the reasons stated by him, at the Circuit, in *Angle* v. *Chicago, St. Paul, Minneapolis & Omaha Railway*, 39 Fed. Rep. 912, and *Farmers' Loan & Trust Co.* v. *Chicago, St. Paul, Minneapolis & Omaha Railway*, 39 Fed. Rep. 143.

His opinion in the *Farmers' Loan & Trust Company's case,* 39 Fed. Rep. 143, was as follows:

" The Farmers Loan and Trust Company, a New York corporation, brings this suit in its capacity as trustee in a mortgage or deed of trust executed January 1, 1881, by the Chicago, Portage & Superior Railway Company, a corporation of Illinois and Wisconsin, having power to construct and equip a railroad from the city of Chicago to a point on the north line of the former State, at or near the village of Genoa, Wisconsin, thence by way of Portage to Superior, at the west end of Lake Superior. The object of the mortgage was to secure the payment of the principal and interest of negotiable bonds which the railway company proposed· to issue, to.·the amount of $10,200,000, and to that end it conveyed .to the plaintiff, as trustee, its entire road, together with all lands, land grants, franchises, privileges, powers, rights, estate, title, interest, and property belonging or appertaining thereto, including a certain grant of lands made by the United States to the State of Wisconsin, and by the latter to the mortgagor company. The mortgage authorized the trustee, upon default in the payment of interest, .to enter upon the premises, and also, in certain contingencies, to sell the mortgaged property. It provided, among other things, that the right of action under it shall be vested exclusively in the plaintiff and its successors in trust, and that under no circumstances should individual bondholders institute a suit, action, or other proceeding, on or under the mortgage, for the purpose of enforcing any remedy therein provided.

". The bill shows that bonds to the amount of $5,000,000 were executed, .and a part of them issued and sold; and that, in respect to the latter, the mortgagor company (which will ·be called the ' Portage Company ') was in default as to interest. It is alleged that the defendant, the· Chicago, St. Paul, Minneapolis & Omaha Railway Company, (which .will be called the ' Omaha Company,') wrongfully claims to be the owner of the lands granted by the State to the Portage Company., such claim being founded upon enactments ·of the legislature of Wisconsin which, the plaintiff avers, are unconstitutional, null, and void. It is also alleged that even if said enactments vested the legal title in the Omaha Company, the latter, for reasons

to be hereafter stated, ought not to be permitted by a court of equity to hold the lands or their proceeds against the plaintiff and the creditors of the Portage Company. A decree is asked declaring this mortgage or deed of trust to be a first lien on the lands, including such as had been or might be certified to the State by the United States as indemnity lands under the above grant.

· "In connection with this general outline of the present suit, it is necessary to state the history of these lands as disclosed by the legislation of Congress and of this State.

"By an act of Congress, approved June 3, 1856, there was granted to Wisconsin, for the purpose of aiding in the construction of a railroad from Madison or Columbus, by the way of Portage City, to the St. Croix river or lake, between townships 25 and 31, and from thence to the west end of Lake Superior, and to Bayfield; and also from Fond du Lac, on Lake Winnebago, northerly to the state line, every alternate section of land, designated by odd numbers, for *six* sections in width, within fifteen miles on each side of said road respectively; the lands to be held by the State, subject to the disposal of the legislature, for no other purpose than the construction of the road for which they were granted or selected, and disposed of only as the work progressed.

"The fourth section provided that the lands be disposed of by the State only in manner following, — that is to say: that a quantity not exceeding one hundred and twenty sections, and included within a continuous length of twenty miles of the roads, respectively, might be sold; and when the governor certified to the Secretary of the Interior that any twenty continuous miles of either road were completed, then another like quantity of the land granted might be sold; and so, from time to time, until the roads were completed; and if they 'are not completed within ten years, no further sales shall be made, and the land unsold shall revert to the United States.' 11 Stat. 20, c. 43.

"By an act of the Wisconsin legislature, approved October 8, 1856, the lands, rights, powers, and privileges granted by Congress were accepted upon the terms, conditions, and reser-

vations contained in the act of June 3, 1856, and the State assumed the execution of the trust thereby created. Laws Wisconsin, 1856, 137, c. 118.

"On the second of March, 1858, the State filed in the General Land Office of the United States a map fixing the definite location of the railway under the act of Congress of June 3, 1856.

"By an act approved May 5, 1864, 13 Stat. 66, c. 80, Congress enlarged the grant of lands in aid of the construction of a road running northerly from the St. Croix river or lake. The first section of that act granted to Wisconsin for the purpose of aiding in the construction of a railroad from a point on that river or lake, between townships 25 and 31, to the west end of Lake Superior, and from some point on the line of the railroad, to be selected by the State, to Bayfield, every alternate section of public land, designated by odd numbers, for ten sections in width, within twenty miles on each side of said road, deducting lands granted for the same purpose by the act of Congress of June 3, 1856, upon the same terms and conditions as are contained in that act; the State to have the right of selecting other lands, nearest to the tier of sections above specified, in lieu of such of those granted as should appear, when the line or route of the road was definitely fixed, to have been sold or otherwise appropriated, or to which the right of preëmption or homestead had attached; which lands 'shall be held by said State for the use of and purpose aforesaid.'

"The time limited for the completion of the roads specified in the act of June 3, 1856, was extended to a period of five years from and after the passage of the act of 1864. Sec. 5.

"The seventh section is in these words: 'That whenever the companies to which this grant is made, or to which the same may be transferred, shall have completed twenty consecutive miles of any portion of said railroads, supplied with all necessary drains, culverts, viaducts, crossings, sidings, bridges, turnouts, watering-places, depots, equipments, furniture, and all other appurtenances of a first-class railroad, patents shall issue conveying the right and title to said lands to the said company entitled thereto, on each side of the road, so far as the same is

completed, and coterminous with said completed section, not exceeding the amount aforesaid, and patents shall in like manner issue as each twenty miles of said railroad is completed: *Provided, however,* That no patents shall issue for any of said lands unless there shall be presented to the Secretary of the Interior a statement, verified' on oath or affirmation by the president of said company, and certified by the governor of the State of Wisconsin, that such twenty miles have been completed in the manner required by this act, and setting forth with certainty the points where such twenty miles begin and where the same end; which oath shall be taken before a judge of a court of record of the United States.'

" The eighth section provided that the lands granted should, when patented as provided in section seven, be subject to the disposal of the companies respectively entitled thereto, for the purposes aforesaid, and no other, and that the railroads be, and remain, public highways for the use of the government of the United States, free from charge for the transportation of its property or troops.

" By a joint resolution of its legislature, approved March 20, 1865, the State accepted the grant made by the act of May 5, 1864, subject to the conditions prescribed by Congress, (Gen. Laws Wisconsin, 1865, 689,) and on the sixth day of May, 1865, filed in the General Land Office of the United States a certificate adopting the location on the map previously filed as the definite location under the last act. That map and location were accepted and approved by the Secretary of the Interior.

" A subsequent act of the legislature, approved March 4; 1874, and published March 11, 1874, (Laws Wisconsin, 1874, 186, c. 126,) granted to the North Wisconsin Railway Company, for the purpose of enabling it to complete the railroad, then partially constructed by it, all the right, title, and interest the State then had, or might thereafter acquire, in and to the lands granted by the acts of Congress to aid in the construction of a railroad from the St. Croix river or lake, between townships 25 and 31, to the west end of Lake Superior and Bayfield, ' except those herein granted to the Chicago and Northern Pacific Air-line Railway Company.'

" The eighth, ninth, twelfth, and fifteenth sections of that act are as follows:

" 'SECTION 8. There is hereby granted to the Chicago and Northern Pacific Air-line Railway Company all the right, title, and interest which the State of Wisconsin now has, or may hereafter acquire, in or to that portion of the lands granted to said State by said two acts of Congress as is or can be made applicable to the construction of that part of the railway of said company lying between the point of intersection of the branches of said grants, as fixed by the surveys and maps on file in the Land Office at Washington, and the west end of Lake Superior. This grant is made upon the express condition that said company shall construct, complete, and put in operation that part of its said railway above mentioned as soon as a railway shall be constructed and put in operation from the city of Hudson to said point of intersection, and within five years from its acceptance of said lands as herein provided, and shall also construct and put in operation the railway of said company from Genoa northerly, at the rate of twenty miles per year.

" 'SECTION 9. The governor is hereby authorized and directed, upon the presentation to him of satisfactory proofs that twenty continuous miles of that part of the railway of said company first above mentioned have been completed in accordance with said acts of Congress and this act, to issue and deliver, or cause to be issued and delivered to said company patents in due form from said State for two hundred sections of said land, and thereafter upon the completion of twenty continuous miles of said railway, he shall issue or cause to be issued and delivered to said company, patents for two hundred sections of said lands, and on the completion of that part of the railway of said company lying between said point of intersection and the west end of Lake Superior, he shall issue and deliver or cause to be issued and delivered to said company, patents for the residue of said lands hereby granted to said company.'

" 'SECTION 12. The said Chicago and Northern Pacific Air-line Railway Company shall, within sixty days from and after

the passage of this act, file with the Secretary of State, a resolution duly adopted by the board of directors, accepting this grant upon the terms and conditions herein contained, and shall also, within said sixty days, give to the State of Wisconsin such security for the completion of that portion of its railway lying between said point of intersection and the west end of Lake Superior, in accordance with the provisions of said acts of Congress and this act, as shall be required by the governor: *Provided, however,* That said security shall be of no force or effect until Congress shall have passed an act renewing said grants or extending the time for the construction of said road, or until it shall have been decided by the Supreme Court of the United States that the present title of the State is absolute and indefeasible; and upon the failure of said company to file said resolution and to give the said security within the time hereinbefore limited, this act shall be of no effect so far as it grants to said company any interest in or right to said lands.'

" ' SECTION 15.   This act shall take effect and be in force from and after its passage and publication.'

" The bond required by the twelfth section of the above act was approved by the governor and filed May 9, 1874.

" Prior to March 16, 1878, the Chicago and Northern Pacific Air-line Railway Company changed its name to that of the Chicago, Portage and Superior Railway Company.

" By an act of the Wisconsin legislature, approved on the day last named, and published March 28, 1878, the time limited by the act of March 4, 1874, for the construction and completion of the railway of the Chicago, Portage & Superior Railway Company, was extended *three* years.   Laws Wisconsin, 1878, 442, c. 229.

" By the first section of an act of the legislature, approved February 16, 1882, (Laws Wisconsin, 1882, 11, c. 10,) it was declared that the grant of lands made to the Chicago, Portage & Superior Railway Company, by the act of March 4, 1874, ' is hereby revoked and annulled, and said lands are hereby resumed by the State of Wisconsin.'

" The second section is in these words: ' There is hereby

granted to the Chicago, St. Paul, Minneapolis & Omaha Railway Company all the right, title, and interest which the State of Wisconsin now has, or may hereafter acquire in and to the lands granted to said State by acts of Congress, approved June 3, 1856, and May 5, 1864, to aid in the construction of a railroad from the St. Croix river or lake to the west end of Lake Superior and Bayfield, which are applicable under said acts of Congress to the construction of that portion of said railroad, from the St. Croix river or lake to the west end of Lake Superior, which lies between the point of intersection of said last-named railroad, by the Bayfield branch, as fixed by the surveys and maps of said railroad, and the branch on file in the General Land Office in Washington, and the west end of Lake Superior. This grant is upon the express condition that the said Chicago, St. Paul, Minneapolis & Omaha Railway Company shall continuously proceed with the construction of the railroad now in part constructed by it between said point of intersection and the west end of Lake Superior, and shall complete the same so as to admit of the running of trains thereover on or before the 1st day of December, A.D. 1882.'

" The seventh section provides that ' Sections 8, 9, and 10 of said chapter 126 of the Laws of 1874, and all acts and parts of acts in any manner contravening or conflicting with the provisions of this act, are hereby repealed.'

" By an act of the Wisconsin legislature, approved March 5, and published March 7, 1883, Laws of 1883, 19, c. 29, it was declared:

" 'SEC. 1. The revocation, annulment, and resumption made by section 1 of chapter 10 of the Laws of Wisconsin for the year 1882, of the land grant mentioned in said section, are hereby fully in all things confirmed.

" 'SEC. 2. The grant of land made by said chapter 10 of the Laws of 1882, to the Chicago, St. Paul, Minneapolis & Omaha Railway Company is hereby in all respects fully confirmed.

" 'SEC. 3. All acts and parts of acts interfering or in any manner conflicting with the provisions of this act are hereby repealed.

" ' SEC. 4. This act shall take effect and be in force from and after its passage and publication.'

" It will be seen from the above statement that the grant in the eighth section of the act of the Wisconsin legislature of March 4, 1874, embraced so much of the lands granted by the acts of Congress of June 3, 1856, and May. 5, 1864, as were applicable to the construction of the part of the road of the Portage Company ' lying between the point of intersection of the branches of said grants, as fixed by the surveys and maps on file in the Land Office at Washington, and the west end of Lake Superior,' — a distance of about sixty-five miles. That is the road to which this suit relates.

" According to the most liberal construction of the act of March 4, 1874, and that of March 16, 1878, the time limited for the completion of that road expired, at least, in May, 1882, eight years after the railway company filed its bond, as required by the ninth section of the act of 1874. It is conceded that the Portage Company never completed its land-grant division. Nor did it ever construct any part of the road from Genoa northerly, as required by the act of 1874.

" The bill alleges that the Portage Company broke down in the monetary panic of 1873-4, under a large load of debts and embarrassments, and lay dormant until late in the year 1880, when its stockholders employed one Gaylord to find parties able and disposed to revive it and put it on the way of success ; that the work of its rehabilitation had so far progressed that in the fall of 1881, and early in 1882, the company borrowed large sums of money and expended them in pushing the construction of the land-grant division in which it was interested ; that, on the 19th of January, 1882, more than one-half of the *substructure* of that division had been completed ; that at the time last named more than sixteen hundred men were at work upon it, and its construction, in ample time to lay the rails and complete the division before May 5, 1882, was assured.

" It is further alleged that the Portage Company would have completed its land-grant road but for the following causes : 1. The passage by the state legislature of the act of February 16, 1882, revoking and annulling the grant contained

in the act of March 4, 1874, which destroyed the credit of the company while it was actively engaged, under many disadvantages, in the construction of its road. 2. That the Omaha Company, its agents and emissaries, interfered with and defeated the efforts of the Portage Company to complete its road within the required time.

"Although the act of June 3, 1856, provided that if the roads therein named were not completed within ten years no further sales should be made, and the lands unsold should revert to the United States; and although the only extension of the period for such completion ever made by Congress was for five years from and after the passage of the act of May 5, 1864, no question is made in the present suit as to the title of these lands being in the State at the date of the passage of the act of March 4, 1874, for all the purposes indicated in the acts of Congress. This, perhaps, is because of the decision in *Schulenberg* v. *Harriman*, 21 Wall. 44, 64, in which the court had occasion to interpret the acts of June 3, 1856, and May 5, 1864; holding that the requirement that the lands remaining unsold after a specified time shall revert to the United States, if the road be not then completed, was nothing more than 'a provision that the grant shall be void if a condition subsequent be not performed;' that when a grant upon condition subsequent proceeds from the government, no individual can assail the title upon the ground that the grantee has failed to perform such condition; and that the United States having taken no action to enforce the forfeiture of the estate granted, 'the title remained in the State as completely as it existed on the day when the title by location of the route of the railroad acquired precision, and became attached to the adjoining alternate sections.' See also *McMicken* v. *United States*, 97 U. S. 204, 217; *Grinnell* v. *Railroad Company*, 103 U. S. 739, 744; *Van Wyck* v. *Knevals*, 106 U. S. 360, 368; *St. Louis, Iron Mountain &c. Railway* v. *McGee,* 115 U. S. 469, 473. These authorities also indicate the mode in which the right to take advantage of the non-performance of a condition subsequent, annexed to a public grant, may be exercised, namely, 'by judicial proceedings authorized by law, the equivalent of

an inquest of office at common law, finding the fact of forfeiture, or adjudging the restoration of the estate on that ground,' or by 'legislative assertion of ownership of the property for breach of the condition, such as an act directing the possession and appropriation of the property, or that it be offered for sale or settlement.'

"The questions to which the attention of the court has been principally directed relate, more or less, to the act of February 16, 1882, revoking and annulling the grant to the Portage Company. The main contention of that company is that the grant of 1874, the acceptance thereof, and the bond given for the performance of the condition as to the construction of the land-grant division, constituted a contract, entitling it to earn the lands by completing the sixty-five miles of railway, to the west end of Lake Superior, by May 5, 1882, without opposition or hindrance on the part of the State; consequently, it is argued, the forfeiture declared by the act of 1882 impaired the obligation of that contract, and was unconstitutional and void.

"On the part of the Omaha Company it is contended that one of the conditions of the grant to the Portage Company was that it would construct and put in operation its road from Genoa northerly at the rate of twenty miles each year; that no part of that road had been constructed when the act of 1882 was passed; and that, by reason of such default, the State had the right to withdraw the grant from the latter company, without regard to what had or had not been done towards the construction of its land-grant division. To this the plaintiff replies that the obligation which the Portage Company assumed with reference to its road from Genoa northerly was not made, nor intended to be made, a condition of its right to earn the lands applicable to that part of the road between the point of intersection of the Bayfield branch with the branch extending to the west end of Lake Superior; and that, consistently with the acts of Congress, the State could not make the right to earn these lands depend upon the construction of any part of its line, except that which Congress intended to aid by the grant.

"It is also contended by the Omaha Company that the grant to the Portage Company was beyond the power of the State to make ; that the mode in which the State disposed of the lands to the latter company was inconsistent with that prescribed in the act of Congress, — that is, that the State had no authority, in advance of the completion of the road, to dispose of the land, by sale, conveyance, or otherwise, beyond one hundred and twenty sections, or to make any additional contract in respect to their disposition.    To this the plaintiff replies that the act of 1864, by necessary implication, permitted the State to dispose of the lands, subject to the conditions of the grant, as to the time when the absolute title should pass from the State to the corporation earning them, and as to the time within which the road should be completed.   Such, it is claimed, was all that was done by the act of 1874.

"As will be seen from the views hereafter expressed touching other questions, it is not necessary to decide whether the eighth section of the act of 1874 made the construction by the Portage Company of its road from Genoa northerly *a condition* of the grant to it of these lands, or whether such a condition could have been legally imposed by the State.    The court is inclined to the opinion that if the Portage Company had duly performed the condition prescribed as to the completion of its land-grant division, its right to the lands applicable to that division, and expressly set apart to aid in its construction, would not have been affected by its failure to construct the Genoa branch.    But the decision will not be placed upon that interpretation of the legislation in question.

"Nor will it be necessary to determine the other questions above stated, nor the question as to the validity of the revocation contained in the act of February 16, 1882.    For if it be assumed that such revocation was a nullity, as impairing the obligation of the alleged contract between the Portage Company and the State, especially because made before the expiration of the period limited for the completion of its road, and while the company was engaged in constructing it; if the mode in which the State disposed of the lands to the Portage Company be conceded to have been consistent with the acts

of Congress; and if the authority of that company to mort-
gage the lands in order to raise money for the construction of
the road be admitted; still, there remain, in the way of grant-
ing the relief sought, these stubborn, indisputable facts:

"*First.* That no corporation could acquire, and, therefore,
could not pass, an interest in the lands, except subject to the
condition prescribed in the act of the state legislature as to
the time within which the land-grant division should be com-
pleted, and, therefore, subject to the right of the State, in
some appropriate mode, to resume its ownership and posses-
sion of the lands for any substantial failure to perform that
condition;

"*Second.* That the road was not constructed or completed
within the time prescribed by the acts of March 4, 1874, and
March 16, 1878;

"*Third.* That, after the expiration of that period, the revo-
cation, annulment, and resumption declared by the act of
February 16, 1882, and the grant in the same act to the
Omaha Company, were in all things confirmed by the act of
March 5, 1883, which, besides, repealed the latter statute and
all previous acts interfering with or in any manner conflicting
with such act of confirmation.

"If the act of February 16, 1882, was a valid exercise of
power by the legislature, that, plainly, is an end of this branch
of the case. But if it was unconstitutional and void, upon any
ground whatever, its passage did not, in a legal sense, deprive
the Portage Company of the right to proceed with the work
of construction, and, by completing the road within the re-
quired time, become entitled to receive patents, or to compel
any corporation or persons to whom patents were wrongfully
issued to surrender the title. The validity and effect of the
confirmatory act of March 5, 1883, does not depend upon the
validity of the act of February 16, 1882; for if the latter act
was void, it was clearly within the power of the legislature,
by the act of 1883, — neither the road, nor any twenty con-
tinuous miles thereof, having at its date been completed by
the Portage Company, — to withdraw or annul the grant to
that company, and to make a new grant of the lands to

another corporation. The revocation in the act of March 5, 1883, of the grant to the Portage Company, accompanied by a confirmation, in the same act, of the grant of the same lands to the Omaha Company, was equivalent to a revocation, made, for the first time, on that day, and to an affirmative grant, then, for the first time, to that company. The passage by the legislature, in 1882, of an act that was void did not prevent it from passing a valid act, in 1883, touching the same subject. In *Strother* v. *Lucas*, 12 Pet. 410, 454, it was said: 'That a grant may be made by a law, as well as a patent pursuant to law, is undoubted (6 Cranch, 128); and a confirmation by a law is as fully, to all intents and purposes, a grant, as if it contained in terms a grant *de novo*.' See also *Field* v. *Seabury*, 19 How. 323, 334; *Langdeau* v. *Hanes*, 21 Wall. 521, 530; *Slidell* v. *Grandjean*, 111 U. S. 412, 439; *Whitney* v. *Morrow*, 112 U. S. 693, 695.

"It results from what has been said that, unless restrained by some legal obligation or contract from revoking the grant to the Portage Company, after the expiration of the time limited for the completion of the road to the west end of Lake Superior, the power of the State to pass the act of March 5, 1883, cannot be questioned. Were the hands of the State tied by any such obligation or contract? It has already been said that the mere revocation of February 16, 1882, if invalid, did not put the State under any legal obligation to forbear the exercise of any power it had after, and by reason of, the failure of that company to complete its land-grant road within the time stipulated.

"Assuming that the completion of the road, within the time limited, was rendered impossible by the act annulling the grant made to the Portage Company, it is contended that the case comes within the familiar rule that 'where a condition subsequent be possible when made, and becomes impossible by act of God or the king's enemy, or the law, or the grantor, the estate, having once vested, is not thereby divested by the failure, but becomes absolute,' citing Co. Litt. 206 *a*, 206 *b*; 4 Kent Com. 130; *Davis* v. *Gray*, 16 Wall. 230, 231. This rule cannot be applied to the present case. It is not to be disputed

that the revocation of the grant to the Portage Company had an injurious effect upon its credit. But, in a legal sense, such revocation by an unconstitutional, void act of legislation — which the plaintiff affirms the act of February 16, 1882, to be — cannot be said to have made impossible the performance of the condition upon which the company's title to the lands depended. The attempted revocation by the legislature, in 1882, and the loss by the company of credit in financial circles, do not, in law, hold the relation of cause and effect. The contrary view is not sustained by *Davis* v. *Gray*, 16 Wall. 203, 230. While the court there recognized the rule excusing the performance of a condition subsequent where performance was rendered impossible by the act of the law, or of the grantor, it was alleged in the bill, and admitted by the demurrer, that the State, by plunging her people into civil war, had herself prevented the railroad company from earning the grant of lands made in aid of the construction of its road. A condition of war, it was conceded, wholly precluded the completion of the road. But, even in that case, performance within a reasonable time was held to be essential to any claim to have the benefit of the grant. Here, there has not been performance by the Portage Company in respect to any part of its land-grant division. If the act of 1882 was void, and if; despite its passage, the Portage Company had completed the road within the required time, it would not be disputed by the plaintiff that, as between the company and the State or any other grantee of the State, the equitable title to lands would have been in that company. Its misfortune — assuming the representations as to its general financial condition to be true — was, that it had no credit of consequence except such as it got from the State's grant of lands; a circumstance that cannot control the determination of the question whether the act of 1882, in a legal sense, rendered it impossible to complete the road in time. If this be not so, it would follow that the act of 1882 would excuse or not excuse the failure of the Portage Company to complete the road within the time, as the evidence was the one way or the other touching its financial ability to have done so, apart from the credit given by the

grant of the lands in dispute. But the rule invoked by the plaintiff surely does not rest upon such a shifting foundation. Within that rule, the impossibility to perform a condition subsequent is either one arising from some obstacle interposed by the grantor, actually precluding or preventing performance by the grantee, or one that ensues, as matter of law, from something that the grantor did or caused to be done. There is no claim of actual interruption by the officers or agents of the State of the construction of the road; and, assuming the act of 1882 to have been unconstitutional, it cannot be true, in any legal sense, that non-performance of the condition, as to the completion of the road within the prescribed time, resulted from the mere passage of that act.

"It remains to consider other aspects of the case that have been presented with marked ability by the counsel for the plaintiff.

"It is contended, in substance, that the forfeiture of the land grant was caused by false representations made to the legislature by the Omaha Company, which desired the transfer of the grant to itself to aid in the construction of its own road, and that that company by fictitious suits, and by corruptly conspiring with officers of the Portage Company, wrongfully and fraudulently prevented the latter company from performing the condition in respect to the time within which the road was to be completed; consequently, the lands and their proceeds should be subjected by a court of equity to the debts of the Portage Company, secured by its land mortgage. The principal allegation of the bill as to what the Omaha Company did is: 'Furthermore, it, and at its instance, others employed by it, and especially the said A. A. Jackson and C. J. Barnes, who were well known as officers of the Portage Company, and understood to be authorized to speak in its behalf, falsely represented to members of said legislature that the Portage Company had made no substantial progress towards the construction of said land-grant division, and never had any considerable number of men at work thereon, and was wholly without means or credit to prosecute said work; that it had at last voluntarily and finally abandoned all attempt to con-

struct the same, and that it was willing to have the grant to it forfeited and given to the Omaha Company ; whereupon, the legislature of Wisconsin, relying on these false representations, and without inquiry or hearing, hurriedly passed the act of February 16, 1882, above named, to forfeit the said land grant of the Portage Company and confer it on the Omaha Company.'

" Undoubtedly the Omaha Company was both willing and anxious that this land grant should be wrested from the Portage Company and transferred to itself ; and to effect that end it appeared by its agents before legislative committees for the purpose of showing that the Portage. Company did not have the means or credit necessary to construct, and never would construct, the road in question within the time fixed. And it may be assumed, for the purposes of this case, that the agents of the Omaha Company made representations as to the condition of the other company that were not in all respects consistent with the truth or with fair dealing. Still, the question arises, how is a judicial tribunal to ascertain the extent to which the action of the legislative. department in revoking this grant was controlled or influenced by representations made to its members by the Omaha Company about the other company ? Can the courts, in any case, assume that the legislature was not fully informed, when it passed a statute relating to public objects, as to every fact essential to an intelligent determination of the matters to which that statute relates? Must it not be conclusively presumed that in disposing of lands held in trust for public purposes it was controlled entirely by considerations of the public good, and not, in any degree, by false representations of individuals having private ends to subserve, and having no special concern either for the. general welfare or for the rights of other individuals ?

" These questions are all answered in numerous adjudged cases, the leading one of which is *Fletcher* v. *Peck*, 6 Cranch, 87, 130, 131. That was an action for breach of certain covenants in a deed made by Peck for lands embraced in a purchase by Gunn and others from the State of Georgia, under an act passed by the legislature of that State. One of the covenants

alleged to have been broken was that all the title the State ever had in the premises had been legally conveyed to Peck, the grantor. It was assigned, in substance, as a breach of that covenant that the act there in question was a nullity, and so the title of the State did not pass to Peck, because its passage was procured by corruption and undue influence used by the original grantees from the State upon members of the legislature. Chief Justice Marshall, speaking for the court, said :

" ' That corruption should find its way into the governments of our infant republics, and contaminate the very source of legislation, or that impure motives should contribute to the passage of a law, or the formation of a legislative contract, are circumstances most deeply to be deplored. How far a court of justice would in any way be competent, on proceedings instituted by the State itself, to vacate a contract thus formed, and to annul rights acquired under that contract by third persons having no notice of the improper means by which it was obtained, is a question which the court would approach with much circumspection. It may well be doubted how far the validity of a law depends upon the motives of its framers, and how far the particular inducements operating on members of the supreme sovereign power of a State, to the formation of a contract by that power, are examinable in a court of justice. If the principle be conceded that an act of the supreme sovereign power might be declared null by a court, in consequence of the means which procured it, still would there be difficulty in saying to what extent those means must be applied to produce this effect. Must it be direct corruption ? or would interest or undue influence of any kind be sufficient ? Must the vitiating cause operate on a majority ? or on what number of the members ? Would the act be null, whatever might be the wish of the nation ? or would its obligation or nullity depend upon the public sentiment ? If the majority of the legislature be corrupted, it may well be doubted whether it be in the province of the judiciary to control their conduct ; and, if less than a majority act from impure motives, the principle by which judicial interference would be regulated is

not clearly discerned. . . . If the title be plainly deduced from a legislative act, which the legislature might constitutionally pass, if the act be clothed with all the requisite forms of a law, a court, sitting as a court of law, cannot sustain a suit brought by one individual against another, founded on the allegation that the act is a nullity, in consequence of the impure motives which influenced certain members of the legislature which passed the law.'

" It is true that there is no suggestion in the present case that the act of revocation of February 16, 1882, was procured by bribery or corruption practised upon members of the Wisconsin legislature. But the charge is that that body was induced by false representations, made by the agents of the Omaha Company, to do what they would not otherwise have done. This difference in the facts does not make the principles announced in *Fletcher v. Peck* inapplicable to the present case; for, if an act of legislation cannot be impeached by proof of corruption upon the part of those who passed it, much less can it be made a matter of proof that legislators were deceived or misled by false representations as to facts involved in proposed legislation of a public character. The principle upon which *Fletcher* v. *Peck* rests excludes all extrinsic evidence of witnesses as to the motives of legislators, or as to the grounds of legislative action. In *Ex parte McArdle*, 7 Wall. 506, 514, the court said: 'We are not at liberty to inquire into the motives of the legislature. We can only examine into its power under the Constitution.' In *Doyle* v. *Continental Insurance Co.*, 94 U. S. 535, 541: 'If the act done by the State is legal, is not in violation of the Constitution or laws of the United States, it is quite out of the power of any court to inquire what was the intention of those who enacted the law.' So, in *Soon Hing* v. *Crowley*, 113 U. S. 703, 710: 'The rule is general with reference to the enactments of all legislative bodies, that the courts cannot inquire into the motives of the legislators in passing them, except as they may be disclosed on the face of the acts, or inferable from their operation, considered with reference to the condition of the country and existing legislation. The

motives of the legislators, considered as the purposes they had in view, will always be presumed to be to accomplish that which follows as the natural and reasonable effect of their enactments. Their motives, considered as the moral induce-ments for their votes, will vary with the different members of the legislative body. The diverse character of such motives, and the impossibility of penetrating into the hearts of men and ascertaining the truth, preclude all such inquiries as impracticable and futile.'

"It was well said by the Supreme Court of Michigan, in *Plank Road Company* v. *Woodhull*, 25 Michigan, 103 : 'The legislature will not only choose its own mode of collecting information to guide its legislative discretion, but from due courtesy to a coördinate department of the government, we must assume that those methods were the suitable and proper ones, and that they led to correct results ; and if the records show no investigation, we must still presume that the proper information was obtained, for we must not suppose the legis-lature to have acted improperly, unadvisedly, or from any other than public motives, under any circumstances, when acting within the limits of its authority.'

" To the same general effect are many other cases : *Aldridge* v. *Williams*, 3 How. 24 ; *Maynard* v. *Hill*, 125 U. S. 190, 209 ; *Johnson* v. *Higgins*, 3 Met. (Ky.) 566, 576 ; *Sunbury & Erie Railroad* v. *Cooper*, 33 Penn. St. 278, 283 ; *Stark* v. *Mc-Gowan*, 1 Nott & McCord, 387, 400 ; *People* v. *Flagg*, 46 N. Y. 405 ; *Wright* v. *Defrees*, 8 Indiana, 298, 302 ; *Jones* v. *Jones*, 12 Penn. St. 350, 357.

" For the reasons stated, evidence as to the falsity or truth of the representations made by the Omaha Company, or its agents, to the legislature, or to legislative committees, in respect either of this land grant or of the Portage Company, as well as evidence as to any efforts by the Omaha Company to bring about the revocation of the grant made to the other company, is immaterial to the present controversy. Such evidence cannot be made the basis of judicial determination without entrenching upon the independence of a coördinate department of the government, and impairing its right to

proceed, in the exercise of its functions, upon such information as it deems necessary. An adjudication as to rights acquired by individuals under public enactments, based upon an inquiry as to whether those individuals made false representations to the legislature, or as to whether the legislature was probably influenced by such representations, is an indirect interference with the power of the legislature, acting within the limits of its authority, to enact such laws as it deems best for the general good. The courts must, of necessity, presume — whatever may be averred to the contrary — that no general statute is ever passed either for want of information upon the part of the legislature, or because it was misled by the false representations of lobbyists or interested parties. They must restrict their inquiries to the validity of such legislation. Such is the established doctrine as to legislative enactments relating to public objects, although a different rule is recognized by some courts in respect to private statutes alleged to have been procured by fraud practised upon the legislature by those claiming benefits under them.

"What has been said disposes of the suggestion that the dispersion of the force employed by the Portage Company in the early part of the year 1882 in the construction of its road, the suspension of the work of construction, and its inability to raise the necessary funds for the completion of the road within the time stipulated, was the result of the machinations of agents of the Omaha Company, acting by its authority, and of the corrupt conspiring by those agents with officers of the Portage Company, whereby those officers neglected to do towards the timely completion of the road what, in fidelity to their employers, they might have done.

"Whether this arraignment of the Omaha Company is justified by the evidence, or whether the Portage Company could, in its weak financial condition in 1882, have completed the road within the required time, if its plans had not been interfered with, in the manner stated, it is not necessary to determine. For, as already indicated, if all that is said in respect to the conduct of the Omaha Company were clearly established, the settled principles of law forbid the court from assuming that

the legislative department of the State when it passed the act of 1882, as well as the confirmatory act of 1883, was not in possession of every fact affecting the justice of such legislation. These principles cannot be disregarded in order to remedy the hardships of particular cases. If each member of the legislature was aware when that act was passed of everything which it is alleged was done by the Omaha Company in regard to this land grant and its rival company, and yet in discharge of what it deemed a public duty, and in order to secure the speedy completion of a public highway, supposed to be imperatively required by the interests of their constituents, the legislature passed the confirmatory act of 1883, and thereby selected the beneficiary of the grant made by Congress in aid of the construction of that highway, the conduct of the Omaha Company surely would not constitute any ground why a court of equity should attempt to thwart the wishes of the legislative department. That is precisely what would be done if the court took from that company the benefit of the grant deliberately made to it by the legislature in aid of the construction of its road. Legislative enactments, relating to public objects, so far as they confer rights upon individuals, must stand, if they be constitutional, without any attempt upon the part of the courts to conjecture or ascertain what the members of the legislature would or would not have done under any given state of facts established by extrinsic evidence.

" It is further said, in behalf of the plaintiff, that the Omaha Company became, as early as January and February, 1882, the owner of every share of the capital stock of the Portage Company, and of a large part of its bonded and floating indebtedness; that the former company built a road from Mud Lake to Superior City, parallel to and a few yards from the half-graded line of the latter company; and that the road so built was such an one as was described in the acts of Congress of 1856 and 1864. Upon these facts the plaintiffs rest the contention, that as that road was constructed by a corporation which was the sole stockholder and a principal creditor of the Portage Company, and as the law avoids forfeitures where

practicable; the condition imposed by the State may be regarded as having been duly performed, within the rule that 'any one who is interested in a condition may perform it, and when performed, it is gone forever;' citing 2 Crabbe's Real Prop. 815; 2 Washb. Real Prop. (2d ed.) 12, and other authorities.

" The court is unable to assent to this view, for the reason, if there were no other, that what was done by the Omaha Company towards the construction of its road to Superior City was not done by it as a stockholder and creditor of the Portage Company. It did not elect or intend, in that capacity, to perform the condition imposed by the State upon the latter company. The record conclusively establishes the fact that in constructing the road to the west end of Lake Superior the Omaha Company proceeded under its own charter, and represented its own stockholders, and not the stockholders of the other company. It built its own branch road, and did not complete the road commenced by the Portage Company. It was so understood by the plaintiff; for it alleges in the bill that 'in the year 1882 the Omaha Company constructed its branch to Superior City, alongside of the partially constructed line of the Portage Company, and has ever since operated the same.' And this is consistent with the second section of the act of February 16, 1882, which made the grant to the Omaha Company upon the express condition that it would continuously proceed with the construction of the road then 'in part constructed by it between said point of intersection and the west end of Lake Superior,' and complete it on or before December 1, 1882. It is impossible to suppose that the Omaha Company ever intended to perform the condition imposed upon the Portage Company in reference to the latter's road. It performed the condition imposed in the act granting these lands in aid of the construction of its road. The plaintiff's whole case proceeds upon the theory that the Omaha Company sought to prevent any result that would be beneficial to the other company. It would, therefore, be a perversion of the rule, upon which the plaintiff relies, and inconsistent with the entire evidence, to say that the Omaha Company was

interested in performing, or intended to perform, or that the State regarded it as performing, the condition in question for or in behalf of the Portage Company. That would make the Omaha Company do something for another corporation which it did not elect to do, and was not in law bound to do.

" Many other questions have been discussed by the counsel of the respective parties, about which the court forbears any expression of opinion. Their determination is rendered unnecessary by the conclusions reached upon the principal points."