# FARMERS' LOAN AND TRUST COMPANY v. CHICAGO, PORTAGE AND SUPERIOR RAILWAY COMPANY AND CHICAGO, ST. PAUL, MINNEAPOLIS AND OMAHA RAILWAY COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF WISCONSIN.

No. 60.   Argued October 18, 21, 22, 1895. — Decided May 4, 1896.

The wrongs specifically charged in the bill in this case are those which were set forth in the suit of *Angle* v. *Chicago, St. Paul, Minneapolis & Omaha Railway Company*, 151 U. S. 1; but there is this difference between the two cases, that in that case the Omaha Company demurred, and on the demurrer a decree was entered against it, whereas, in this case, the Omaha Company took issue upon the charge of having committed such wrongs, and the testimony shows that it did not commit them.

The act of the legislature of Wisconsin of 1882, revoking the grant of land to the Portage Company and bestowing it upon the Omaha Company, neither in terms nor by implication burdened the transfer with a continuing obligation for the debts of the Portage Company; and no creditor of the Portage Company had any legal or equitable right to any portion of those lands.

THE case is stated in the opinion.

*Mr. Thomas Ewing* and *Mr. Milton I. Southard*, (with whom was *Mr. Herbert B. Turner* on the brief,) for appellant.

*Mr. Thomas Wilson* for appellees.   *Mr. Charles M. Osborn* and *Mr. Samuel A. Lynde* were on his brief.

MR. JUSTICE BREWER delivered the opinion of the court.

This case comes before us on appeal from a decree of the Circuit Court for the Western District of Wisconsin, of date September 2, 1889, dismissing the bill of plaintiff and appellant for want of equity. The original bill was filed in that court on July 25, 1883. The defendants named therein were

the Chicago, Portage and Superior Railway Company, (to be hereafter called the Portage Company, the Chicago, St. Paul, Minneapolis and Omaha Railway Company, (to be hereafter called the Omaha Company,) Ransom R. Cable, Henry H. Porter, A. A. Jackson and Charles J. Barnes. After some preliminary pleadings the defendants filed answers, testimony was taken, and the case was submitted for hearing on the pleadings and proofs.

The plaintiff sued as trustee in a deed of trust executed by the Portage Company on January 1, 1881, to secure a proposed issue of negotiable bonds to the amount of $10,200,000, of which 758 bonds of $1000 each were claimed to be still outstanding and unpaid. The deed of trust covered all the property of the railway company, including a certain grant of lands made by the United States to the State of Wisconsin and transferred by the State to it. The claim, in a general way, was that these lands had been wrongfully wrested by the Omaha Company from the Portage Company, and a decree was asked declaring this deed of trust a first lien on such lands. The wrongs specifically charged in the bill are those set forth in the suit of Angle against the same two railway companies, reported in 151 U. S. 1, to which case, therefore, reference may be had for a full statement thereof. That case was disposed of on demurrer, while this is before us upon the proofs; and in view of the opinion there filed the question we have now to consider is whether the testimony sustains the charges.

The plaintiff states three propositions, each of which it claims is established by the evidence, and either one of which it says entitles it to the relief prayed for:

" First. — That the Omaha Company wrongfully and fraudulently prevented the Portage Company from complying with the conditions of the grant, and caused the grant to be transferred to itself.

" Second. — That the Omaha Company, by its wrongful acts, became the sole stockholder of the Portage Company, and as such stockholder wrongfully and fraudulently used its powers and position to strip the Portage Company of its property and transfer it to itself.

" Third. — That the act of the legislature of Wisconsin of February 16, 1882, revoking the grant to the Portage Company, and the act of March 7, 1883, confirming the revocation, did not divest or attempt to divest the creditors of the Portage Company of their legal or equitable rights, nor attempt to prevent them from having these lands appropriated so far as may be necessary to the satisfaction of their debts. Otherwise these acts would be null and void as impairing the obligation of a contract and invading private rights."

Involved in and essential to the plaintiff's case is the specific charge that the Omaha Company bribed certain officials of the Portage Company (in whose hands was perhaps the only valid outstanding stock of the Portage Company, and held by them in trust) to dispose of that stock, so that the Omaha Company, with knowledge of the trust attending the stock, and in breach thereof, became the controlling, if not the sole, stockholder in the Portage Company. It is true that on January 20, 1882, A. A. Jackson, of Janesville, Wisconsin, C. J. Barnes, of the city of Chicago, Illinois, and J. C. Barnes, of the city of New York, transferred to R. R. Cable, who was acting for the Omaha Company, one million dollars of the capital stock of the Portage Company standing in the name of Jackson, and so much of another million dollars of capital stock, standing in the name of J. C. Barnes, as was absolutely valid and full paid stock, together with five hundred shares standing in the name of C. J. Barnes. This transaction is challenged, and its honesty and good faith are primary matters of inquiry.

In order to a clear understanding a brief statement of what had theretofore transpired is essential. Prior to 1880 the Portage Company had done a little work in the construction of the line aided by the land grant, and but little. The work had been stopped, and the company was practically a dormant corporation, owning the land grant and subject to certain indebtedness. Its principal, if not sole, creditor was the Chicago and Northern Construction. Company, which had done all the work on the road. This construction company, having expended some money in construction, for which the railroad

company was indebted to it, was itself indebted to A. A. Jackson, an attorney of Janesville, in the sum of $18,000; to I. C. Sloan, an attorney of Madison, in the sum of $2000; and to Edward Ruger, of Janesville, for engineering services, in the sum of $10,000, (for which sums these parties had recovered judgments,) and to others in smaller sums, aggregating not exceeding $10,000. At the time of the negotiation hereafter referred to, with Gaylord and others, the railway company had issued $400,000 in bonds and $500,000 stock, of which issue the construction company owned and held all the bonds and $350,000 of the stock. Mr. J. C. Barnes was the individual who had put the most money into the construction company, and was practically its owner. In the summer of 1880 one Willis Gaylord entered into arrangements with Barnes for the reorganization of the railway company, and the securing of means for the construction of the road. The exact terms of the arrangements between Gaylord and Barnes may be open to some question, for Gaylord was not produced as a witness, and Barnes' recollection was not clear. A contract in writing, executed on the 20th of September, 1880, between Gaylord, the New England and Western Investment Company and William H. Schofield, by which the latter two parties were to render their services in securing funds for the building of the road, throws some light on the question. It recites:

"And whereas, in the securing of said railway company's charter, land grant, rights of way, surveys, about sixty (60) miles of roadbed graded and other lawful and proper expenses, there has been over seven hundred thousand dollars of money expended, which is represented by the aforesaid charter, land grant, rights of way and other property, it is to be provided that out of the new series of first mortgage bonds there is to be set apart and made a special trust seven hundred (700) of said new first mortgage bonds of $1000 each; also ten per cent of the capital stock of the company, and, by the order in writing of said Willis Gaylord, countersigned by the president of said railway company, paid to the persons entitled to receive the same, as designated by the said Gaylord, in full liquidation and satisfaction of all claims and demands (except as

hereinafter stated) of the present owners of said railway, and for all expenditures and claims made and due for said charter, land grant, right of way, surveying, grading and all and every kind of expense on account of said railway company (not including a certain amount of floating debt now outstanding, which does not exceed forty thousand dollars ($40,000) and to be provided for hereinafter), and the aforesaid $700,000 in first mortgage bonds are to have the interest coupons for the first two years from their date cut off and cancelled, and the said bonds, together with ten per cent of the capital stock as aforesaid are to be placed in trust, as a special trust, and be delivered to the parties entitled to receive the same, as designated by the said Gaylord, to be delivered, however, only *pro rata*, as the other bonds and stock are delivered for material or money, and as the road is constructed and put in operation in sections of ten (10) miles each.

"And whereas there is in the form of floating debt, in lawful and proper claims, approximately but not exceeding $40,000, it is to be provided that when, through said examination, the enterprise is found to be satisfactory to said investment company, and the proposed new bonds and stock are prepared and deposited as herein provided for, then said investment company will proceed at once to the negotiation of the same, and will, as soon as cash to the amount of $40,000 shall have been procured, pay or cause to be paid said sum to A. S. Barnes & Co., in payment of said floating debt, and on such payment being made, the reorganization or substitution of new directors and officers of said railway company, as herein provided, shall then take place.

"And the said Gaylord shall furnish satisfactory evidence and assurance that the said $700,000 of first mortgage bonds and ten per cent of capital stock will pay, cancel and fully release all claims, demands and incumbrances against said railway company, except said floating debt, and that the floating debt aforesaid does not and shall not exceed $40,000."

Apparently, from this recital, the $40,000, or such a matter, due by the construction company to Jackson and others, was treated as a debt of the railway company and was to be paid

in cash, leaving the indebtedness of the railway company to the construction company to be satisfied by the $700,000 bonds and the 10 per cent of the stock. It would seem from other evidence that Barnes was to take $350,000 of the bonds and the stock and Gaylord was to take the balance of the bonds, although there is testimony that Gaylord was to receive fifty of the Barnes bonds for personal services and by way of commission. There was a modification of this contract on January 20, 1881, but the change is not material to this controversy. On March 28, 1881, the action of Gaylord in the two contracts of September 20, 1880, and January 20, 1881, was approved by the directors of the railway company, who also, on the same date, passed a resolution as follows:

"*Resolved,* . . . that for all present outstanding stock certificates new certificates of stock for a like amount shall be issued and delivered to the parties entitled to receive the same upon the surrender and cancellation of their old certificates of stock and in exchange therefor."

The second day thereafter, on March 30, a resolution was passed, which, after referring to the appropriation of bonds to the amount of $700,000 and stock to the amount of a million for the purpose of discharging the indebtedness of the company, recites the receipt of full value in real property and other valuable consideration for such bonds and stock, and gives the consent of the company to the immediate issue of one half the amount thereof.

Just before the passage of these two resolutions, and on March 26, 1881, the construction company assigned to Jackson its claim against the railway company for bonds and stock, as well as all of its claims and demands of any and every kind against the railway company. Jackson took this assignment really for J. C. Barnes, and was to hold the claim, thus assigned, for him until he should be able to pay the amounts due to Ruger, Sloan and others. Subsequently, and on May 17, 1881, Jackson forwarded to the president of the railway company a letter, giving notice of the assignment, stating that of the 400 bonds which had belonged to the construction company 361 had been surrendered to the railway company

to be exchanged for new bonds, and that he had in his possession the remaining 39, and proposing to surrender the 39 and release all claims for the 361 upon the issue to him of $650,000 of full paid stock. Whereupon the board of directors took the following action:

"On motion of Wm. T. Watson, duly seconded, the following resolution was adopted:

"Whereas A. A. Jackson, as the assignee of the Chicago and Northern Pacific Construction Company, holds 39 bonds of this company issued by this company under its former name of the Chicago and Northern Pacific Air Line Railway Company, bearing date July 1, 1872, with the coupons thereto annexed, and as assignee of said construction company he is also entitled to receive from this company 361 bonds of this company of $1000 each, with interest thereon from the 1st day of July, 1872, at the rate of seven per cent per annum, amounting in all, on the 1st day of June, 1881, to the sum of $649,663.00; and

"Whereas the said Jackson has made a proposition to this company, in writing, proposing to surrender to this company said 39 bonds so held by him and to release this company from its liability and obligation to deliver to him 361 bonds and interest upon the company issuing and delivering to him 6500 shares of the capital stock of this company:

"Therefore Resolved, That the proposition of A. A. Jackson be, and the same is hereby, accepted, and the president and secretary are hereby authorized and directed to sign, seal and deliver to said A. A. Jackson certificates of full paid stock of this company of the par value of $650,000, upon said Jackson's delivery to them of said 39 bonds, with the coupons thereto annexed, and a properly executed instrument releasing and discharging this company from its liability and obligation to execute and deliver to him bonds of this company for $361,000 and interest at 7 per cent from July 1, 1872, in pursuance of his proposition; and

"Resolved, That the proposition of A. A. Jackson be entered upon the records of this company in connection with this order."

In accordance, therefore, with the terms of this resolution, and that of March 28, heretofore quoted, Jackson was entitled to receive, on the surrender of the $350,000 of old stock and 39 bonds in his possession and the release of all claim in respect to the 361 theretofore surrendered, the sum of $1,000,000 in full paid stock of the company. This stock when issued to Jackson would, under the arrangement between him and Barnes, be held by Jackson for the benefit of J. C. Barnes. This stock was in fact issued and delivered to Barnes for Jackson. That this stock was not obtained surreptitiously, but delivered knowingly by the officers of the company to Barnes for Jackson, is evidenced by the following letters and receipt, the letters being signed by the president of the company:

"Chicago, Portage and Superior Railway Company. Wm. H. Schofield, President.

"PRESIDENT's OFFICE, 150 BROADWAY,
"NEW YORK, *June* 18, 1881.
"R. G. Rolston, Esq'r, President Farmers' Loan and Trust Company, New York.

"DEAR SIR: I have this day deposited with the Farmers' Loan and Trust Company eight thousand six hundred and fifty (8650) shares of $100 each of the capital stock of the Chicago, Portage and Superior Railway Company to be paid out or delivered by you upon special orders by me prepared and this day left with you for acceptance. Will you please sign the form of acceptance on said stock orders, and when so signed and upon the presentation and surrender to you of this order deliver to Jno. C. Barnes, Esq'r, the aforesaid special orders representing the said 8650 shares of stock, and this is your general authority for the delivery of said stock to the persons and at the terms named in said special orders.

"CHICAGO, PORTAGE AND SUPERIOR RAILWAY COMPANY,
"By WM. H. SCHOFIELD, *President.*"

"Office of the Farmers' Loan and Trust Company, 26 Exchange Place, cor. William St.

"NEW YORK, *June* 17, 1881.

"Received from the Farmers' Loan and Trust Company certificates for the delivery of eighty-six hundred and fifty shares of the capital stock of the Chicago, Portage and Superior Railway Company in accordance with the terms of said certificates.

"J. C. BARNES.

"Per E. D. HOTCHKISS."

"NEW YORK, *Oct.* 22, 1881.

"To the Farmers' Loan and Trust Co., New York:

"You are hereby authorized and directed to deliver to John C. Barnes, Esq., of the city of New York, all the certificates of the capital stock of the Chicago, Portage and Superior Railway Company, referred to and described in 90 certain orders signed and accepted by you, on the surrender to you of all of said orders, without regard to any of the conditions or limitations contained or specified in said orders.

"CHICAGO, PORTAGE AND SUPERIOR RAILWAY COMPANY,

"By WILLIAM H. SCHOFIELD, *President.*"

Further, on the stubs of the stock book of the company, in the handwriting of the president, except the signature of J. C. Barnes, appear these entries:

On the stub of certificate numbered 1 (the stubs of certificates from 1 to 90, inclusive, being precisely similar except in number of shares): "On acc't stock, bonds & interest cancelled and returned. No. 1 for 500 shares June 18, 1881. Issued to A. A. Jackson of Janesville, Wisconsin. Received certificate No. 1, as above described, June 18, 1881."

And on stub No. 132: "On account of stock, bonds & int. cancelled & returned. No. 132 for 1350 shares October 24, 1881. Issued to A. A. Jackson of Janesville, Wis. To make bal. of 1,000,000 June 18, '81. Received certificate No. 132, as above described, Oct. 24, 1881, for A. A. Jackson, $1,000,000

in ten thousand shares. Dated June 18, '81, and present date. J. C. Barnes."

On the day of receiving the last of these stock certificates, to wit, October 24, Barnes wrote to Jackson, advising him of the issue of the 10,000 shares in his name; that the certificates were in his (Barnes') hands, and that he, Jackson, could vote on that stock. On October 31 Jackson, being in New York, received from Barnes this receipt:

"A. S. Barnes & Co., publishers.

"NEW YORK, *Octo.* 31, 1881.

"Received from A. A. Jackson ninety-one (91) certificates of stock of the Chicago, Portage and Superior Railway Company, aggregating ten thousand (10,000) shares, as follows:

"No. 1 to  5, inc., 500 sh's ea.............. 2,500
"  6 " 55,  " 100 " "  .............. 5,000
" 56 " 75,  "  50 " "  .............. 1,000
" 76 " 90,  "  10 " "  ..............   150
" 132 for ...:........................ 1,350
                                         _____
"Total shares...................... 10,000

"The above certificates are issued to A. A. Jackson and have not been transferred, but are held for his future order.

"J. C. BARNES."

Jackson took that receipt, as he testifies, simply because he did not care to carry the certificates home, and wished something to show where they were and that they were held subject to his order. On November 15 thereafter J. C. Barnes transmitted to his nephew, C. J. Barnes, in Chicago, the stock, accompanied by this letter and power of attorney:

"NEW YORK, *Nov.* 15, 1881.

"Charles J. Barnes:

"By express to-day I send you ten thousand shares of C., P. & S. railway stock, issued to A. A. Jackson, and which belonged to him for settlement of construction company's claims, etc. I send these shares at the request of Mr. Jack-

son. He will explain why they are sent, and his argument agrees with my own convictions. These shares are not ever to be parted from your custody, except as it shall be deemed necessary to protect the mutual interest of Jackson, yourself and myself, and are only to be used in extreme case of necessity for our mutual benefit. I also enclose authority to sell the ten thousand shares which stand in my name on the company book.                                        J. C. BARNES.

"NEW YORK, *November* 15, 1881.

"This is to say that Charles J. Barnes is my true and lawful attorney for negotiation and sale of a certain number of certificates of stock standing in my name on the books of the Chicago, Portage and Superior Railway Co., said certificates dated June, 1881, and aggregating $1,000,000.

"J. C. BARNES."

It would seem clear from this evidence, not depending on imperfections of memory, but contained in writings, (many of them on the books of the company and made by its officers,) that Jackson was the legal holder of this million of dollars of stock, free from all obligation to the company, and subject only to the trust in favor of J. C. Barnes. It is difficult to see why Jackson did not have the legal right, with the assent of Barnes, to dispose of this stock to whomsoever he saw fit, and at any price he could obtain. The debt of the railway company to the construction company is not disputed; the documentary evidence establishes that for that debt the company issued this stock as full paid stock; no limitations are expressed in the proposition of Jackson or the resolution of acceptance, and for aught that these records disclose he had the same right and control over this stock, subject only to his trust in favor of Barnes, that any stockholder in any corporation has over his. It is true that the transaction between Jackson and the railway company seems to involve some departure from the arrangement indicated by the contract between Gaylord and others, of September 20, 1880, for that apparently contemplated the issue of $700,000 of bonds,

$1,000,000 stock and the payment of $40,000 in cash in satisfaction of all the debts of the railway company; but this transaction was the later one, and, in so far as it modified the earlier arrangement, superseded it. It is probable that there was in fact no modification, but only an addition, and that Gaylord and J. C. Barnes still expected to receive $700,000 in bonds and $1,000,000 in stock, in addition to this $1,000,000 of stock issued to Jackson, for additional certificates of stock to the amount of $1,000,000 were made out by the officers of the company in the name of J. C. Barnes, though never delivered to him. Apparently they regarded this as a bonus for their services.

It is this last $1,000,000 of stock which is referred to in the authority given by J. C. Barnes to C. J. Barnes of November 15, 1881, heretofore quoted, and also in the following letter of authority given on November 19 by J. C. Barnes to Jackson:

" A. A. Jackson, Esq., Janesville, Wis. :

"I hereby authorize and empower you to negotiate the sale for me of the certain ten thousand (10,000) shares of stock now standing in my name on the books of the Chicago, Portage and Superior Railway Company, said shares representing the par value of one million dollars.

"J. C. BARNES."

It was evidently the doubt as to the validity of this latter stock as full paid stock that induced the parties in making the transfer to Cable to thus describe it in their contract of sale: "And so much of the ten thousand shares of the capital stock standing in the name of John C. Barnes, aforesaid, on the books of said company (which last named stock said Jackson and C. J. Barnes, as agents of said John C. Barnes, are authorized and empowered to sell upon such terms as they shall see fit, a copy of the said authority from said John C. Barnes to said A. A. Jackson being hereto annexed and made a part hereof) as is absolutely valid and full paid stock."

We do not deem it necessary to enter into any consideration of the question of its validity, or whether it was full paid

stock, and only refer to it for the purpose of showing that the transaction with Jackson was independent of the arrangement between Gaylord and Barnes, and was unaccompanied by any conditions which may be claimed to have attached to the stock issued in Barnes' name.

The testimony further discloses that, from some time in the latter part of 1881 until the sale made by Jackson to Cable, Schofield, as the president of the railway company, was negotiating with the officers of the Grand Trunk Railway Company with a view to securing their interest in the Portage Company, and their aid in floating its bonds in European markets, and that those negotiations had proceeded finally so far as to disclose a possibility, perhaps a probability, of success. Jackson and J. C. Barnes were aware of the pendency of these negotiations, and of the various steps therein, so far as they were disclosed by the records of the Portage Company, and the contracts which were reported by Schofield to the directors of that company. The Grand Trunk Company having secured an entrance into Chicago, evidently saw the possibility of benefit to itself in obtaining control of a road running into the far Northwest, and upon that view entered into these negotiations. It is also true that when the Grand Trunk Company found that Cable, acting for the Omaha Company, had purchased this Jackson stock, it abandoned all negotiations and gave up the thought of attempting to secure control of the Portage Company. It is claimed by Jackson that the delays in negotiations with the Grand Trunk Company were such that he had lost all confidence in their success; that he offered the stock to officers of that company at the same price that Cable subsequently paid for it, and that they declined to take it.

Putting the most unfavorable construction upon the testimony, it does not seem to us that either Jackson or Barnes can be condemned of any breach of trust, or other obligation, to the Portage Company when, having offered the stock to the Grand Trunk Company, at the price afterwards paid by Cable, and such offer having been declined, they sold it to the Omaha Company. It may be that thereby Schofield and

Gaylord were deprived of the profits which they expected to secure by successfully carrying through the negotiations with the Grand Trunk Company, but we do not understand that one stockholder is, by virtue of his ownership of stock, bound to continue in the holding of it in order to allow another stockholder to make a profit out of negotiations then pending. Jackson and Barnes had the same right to look after their own interests in the sale of the stock that Schofield and Gaylord had after theirs in the negotiations with the Grand Trunk Company. It seems very probable, if we may speculate as to what would have been the result if the negotiations with the Grand Trunk Company had been successfully carried to completion, that the $1,000,000 of stock which Jackson held, instead of being worth $200,000, would have been worth little or nothing, and we do not understand that a stockholder is under obligations, legal or moral, to sacrifice his personal interests in order to secure the welfare of the corporation of which he is a stockholder or to enable another stockholder to make gains and profits.

In short, to sum up this branch of the case, from the testimony in this record it is, we think, clear that Jackson was guilty of no breach of trust in selling this stock; that it belonged, both legally and equitably, to J. C. Barnes and himself; that they had a full legal and moral right to sell it to any one who would pay their price, and it equally follows that the Omaha Company and Cable, in making the purchase, were themselves guilty of no wrong.

Another claim is that the Omaha Company wrongfully prevented the Portage Company from earning the land grant. This, it is said, was done by inducing the general manager of the company to withdraw the engineering corps and to stop the contractor from proceeding with the work of construction, and, after all work had in fact been stopped, by false swearing securing an *ex parte* injunction to restrain the officials of the Portage Company from any further efforts in its behalf. But the testimony does not make good these charges. It is true Mr. Cable, after his purchase of the stock, asked Mr. Peck, the general manager, to discontinue the work of con-

struction, but the latter, as he himself testifies, declined to do this, not recognizing Mr. Cable as having any authority in the matter. He did, however, after consultation with the president and learning that negotiations for the assistance of the Grand Trunk Company had been abandoned, notify the contractors by telegraph of the fact, and that there seemed to be no immediate prospect of raising money to continue the work. With reference to the alleged obtaining of an *ex parte* injunction on false affidavits, the facts are these: The president of the Portage Company, who was a resident of New York, after the giving up of the negotiations with the Grand Trunk Company, returned to that city, and there had in his possession the books and papers of the company — indeed, for all practical purposes, the office of the company seems to have been theretofore transferred from Chicago to New York. Mr. Cable sought to have the stock which he had purchased transferred on the stock books of the company, but failed in his efforts. He was informed that the president was calling special meetings of the directors of the company in New York without giving notice to the local directors and without their presence, and by virtue of authority granted at such meetings was disposing of bonds and stock — information which we regret to say had no slight foundation in the actual facts. Whereupon he filed his bill in the Circuit Court of Cook County, Illinois, which, reciting his purchase and ownership of the stock, the conduct of the president and other officials of the corporation, as above stated, prayed an injunction against the Portage Company and its president. In order that the exact scope of this injunction may be apparent we quote from the prayer in the bill, the order of the court being that an injunction issue as prayed for:

"That a preliminary injunction issue restraining the defendants and their officers, directors, agents and servants from issuing or causing or allowing to be issued any of the capital stock of said corporation, and from issuing, selling, pledging or causing to be issued or sold or pledged, any of the mortgage bonds of said corporation until the further order of this court, and also restraining said defendants and their officers,

directors, servants and agents from transferring or allowing to be transferred upon the books of said corporation any of the capital stock which has been issued by said Schofield as above stated and which is above charged to have been wrongfully, fraudulently and improperly issued, or any other fraudulent capital stock of said company, and that said defendants, their officers, agents and servants, be also restrained and prohibited from calling or holding or causing to be called or held any meeting of the directors of said corporation or attempting to transact business at such meeting and from taking part as an officer or director at such meeting unless full notice of such meeting and the time and place of holding the same shall have been given to each of the above named directors of said corporation, and not in that event unless such meeting and meetings shall be notified to be held and shall be held at the principal office of said corporation, in the city of Chicago, in the State of Illinois.

" And that until such time as said books and papers of said corporation shall be returned to and kept at its office in the city of Chicago aforesaid, open to the inspection of your orator, said defendants will be prohibited and restrained from doing any act or thing concerning or affecting the financial affairs of said corporation for the amount of its liabilities or the amount of its capital stock, and from entering upon the records of said company any statement or record of its actings or doings."

It is true that the temporary restraining order, or temporary injunction, was granted on the 9th day of February, 1882, without notice, but the defendants were in a few days served with process. They made no attempt to have the order vacated, but, on the contrary, on March 20, 1882, the Portage Company filed a cross-bill seeking to restrain Cable from disposing of the stock he had purchased, and praying that it be delivered up for cancellation. Nothing, however, came of this litigation, and it was abandoned in consequence of negotiations and a settlement between Cable and the investment company.

Finally, it is insisted that the Omaha Company wrongfully

and fraudulently secured through the action of the legislature of the State of Wisconsin a transfer of the land grant to itself, and further that the action of the legislature in making such transfer did not divest, or attempt to divest, the creditors of the Portage Company of their legal or equitable rights, nor prevent them from having the lands appropriated so far as was necessary to the satisfaction of their debts.

With reference to the first portion of this charge, it is sufficient to say that there is absolutely no foundation for it in the testimony. It does not appear that there was any corruption, or attempted corruption, by the Omaha Company of any of the members of the legislature, or other officials. Everything it did was open and above board. At the instance of the officials of the Portage Company it consented that a stipulation be introduced into the act of forfeiture and transfer that it should pay to the governor of the State the sum of $78,000, to be used in payment of labor claims for work done on the Portage Company's line, and after the passage of the act it did pay the stipulated sum. We are left, therefore, to the single question whether the act of the legislature, either in terms or by implication, burdened the transfer with a continuing obligation for the debts of the Portage Company. No such burden was in terms imposed. The grant was, so far as the legislative action discloses, simply taken away from the Portage Company because of a failure to comply with the conditions under which it had originally been bestowed upon it. On such failure of the Portage Company all its right to the lands ceased. Whatever the legislature might thereafter do in its behalf was a mere act of grace. No creditor of the Portage Company had any legal or equitable right to any portion of those lands, and if the legislature had simply revoked the grant and resumed possession on behalf of the State there would be no pretence of a claim that any such creditor could subject the lands, or any interest therein, to the satisfaction of his debt. There is no intimation of a contrary doctrine in the opinion filed in *Railway Company* v. *Angle, supra.* All that was there held was that the legislative action did not condone, and was not intended to condone,

any wrongs done by the Omaha Company; and that if the Omaha Company had been guilty of any fraudulent conduct, in consequence of which the Portage Company had been prevented from earning the grant and the legislature thereby induced to revoke it and bestow it upon the Omaha Company, the party wronged by those acts of the Omaha Company was entitled to redress. But here, as we have seen, although the charges are the same, yet the testimony fails to make good those charges, or to show any fraudulent or wrongful conduct on the part of the Omaha Company. The legislative act condoned no wrong, for there was no wrong to condone. It neither placed nor continued any burden upon the land grant, and hence the mortgage creditors of the Portage Company, having no lien, legal or equitable, cannot pursue the lands in the hands of the Omaha Company.

There is this substantial difference between the *Angle case* and the present: While in each are charges of grievous wrong on the part of the Omaha Company, in consequence of which property which otherwise would have been subjected to the payment of the plaintiff's claims was obtained by the Omaha Company, in the *Angle case* the Omaha Company demurred, saying there was no remedy notwithstanding the wrongs alleged. We held that if such wrongs as were alleged had been committed, the law did furnish a remedy. In this case the Omaha Company took issue upon the charge of having committed such wrongs, and the testimony shows that it did not commit them. So the proof fails to make good the charges, and the decree of the Circuit Court was right, and is

*Affirmed.*

MR. JUSTICE HARLAN concurs in the result upon the grounds stated in his opinion at the circuit. 39 Fed. Rep. 143; 151 U. S. 1–28.