ANGLE et al. v. CHICAGO, ST. P., M. & O. RY. CO. et al.

(Circuit Court of Appeals, Seventh Circuit.   June 6, 1899.)

No. 501.

RAILROADS—ISSUANCE OF STOCK—TRUSTS.
    A holder of railroad stock, issued to him as full paid, in payment of an undisputed claim, takes it free of all trusts created in favor of the railroad company by previous contracts to which he was not a party.

Appeal from the Circuit Court of the United States for the Western District of Wisconsin.

B. W. Jones and M. I. Southard, for appellants.
Thomas Wilson, for appellees.

Before WOODS, JENKINS, and GROSSCUP, Circuit Judges.

WOODS, Circuit Judge. For a statement of the averments of the bill in this case reference is made to the opinion of the supreme court on demurrer thereto in Angle v. Railway Co., 151 U. S. 1, 14 Sup. Ct. 240. This appeal is from a final decree on the merits dismissing the bill for want of proof of the alleged conspiracy and fraud. Before the hearing was had which resulted in that decree, another suit, against the Omaha Company and the Portage Com-

pany, wherein a bill averring the same facts as are here alleged was brought by the Farmers' Loan & Trust Company, as trustee of a mortgage executed by the Portage Company, for the purpose of charging the lands embraced in the disputed grant with the lien of that mortgage, had been determined in favor of the defendants on evidence which the court below deemed to be substantially the same as the evidence in this case, and on appeal that decree had been affirmed. Farmers' Loan & Trust Co. v. Chicago, P. & S. R. Co., 163 U. S. 31, 16 Sup. Ct. 917. The opinion in that case shows that three propositions were claimed to be established by the evidence, any one of which it was contended entitled the plaintiff to the relief prayed for. The first two of those propositions, placing the second first, are in essence the same as the following, which are insisted upon here: First. The evidence establishes that the Omaha Company became the sole or controlling stockholder of the Portage Company, and as such stockholder caused to be transferred to itself all of the property of the Portage Company, including its land grant, so as to deprive Angle, a creditor of the Portage Company, of payment of his debt. By thus wrongfully acquiring the property of the Portage Company, the Omaha Company became trustee of the property for the satisfaction of the judgment. Second. The evidence establishes that the Omaha Company wrongfully, unlawfully, unconscientiously, maliciously, or fraudulently interfered and prevented Angle and the Portage Company from completing the work of construction under the Angle contract, and from earning the land grant, and took over to itself the property of the Portage Company, including the land grant. It thereby became liable to Angle for the damage done to him as measured by complainants' judgment against the Portage Company, and became trustee ex maleficio of the land grant and its proceeds for the satisfaction of the judgment. These propositions both rest upon the charge of conspiracy and fraud. To use the language of the supreme court:

"Involved in and essential to the plaintiff's case is the specific charge that the Omaha Company bribed certain officials of the Portage Company (in whose hands was, perhaps, the only valid outstanding stock of the Portage Company, and held by them in trust) to dispose of that stock, so that the Omaha Company, with knowledge of the trust attending the stock, and in breach thereof, became the controlling, if not the sole, stockholder in the Portage Company."

It is said in the brief for appellant that "this declaration is clearly limited to the trust character of the Jackson stock," but the language used, the context and other parts of the opinion, do not seem to warrant so narrow a construction. The opinion proceeds immediately to state the fact of the transfer of the Jackson stock to Cable, and then says, "This transaction is challenged, and its honesty and good faith are primary matters of inquiry." Then follows a review of the evidence, ending on page 44, 163 U. S., and page 922, 16 Sup. Ct., with the following statement of the court's conclusion:

"In short, to sum up this branch of the case, from the testimony in this record it is, we think, clear that Jackson was guilty of no breach of trust in

selling this stock; that it belonged, both legally and equitably, to J. C. Barnes and himself; that they had a full legal and moral right to sell it to any one who would pay their price; and it equally follows that the Omaha Company and Cable, in making the purchase, were themselves guilty of no wrong."

This is followed with a brief consideration of the charge that the Omaha Company wrongfully prevented the Portage Company from earning the land grant. The conclusion of the opinion is of present importance:

"No creditor of the Portage Company had any legal or equitable right to any portion of those lands; and if the legislature had simply revoked the grant, and resumed possession on behalf of the state, there would be no pretense of a claim that any such creditor could subject the lands, or any interest therein, to the satisfaction of his debt. There is no intimation of a contrary doctrine in the opinion filed in Angle v. Railway Co., supra. All that was there held was that the legislative action did not condone, and was not intended to condone, any wrongs done by the Omaha Company; and that, if the Omaha Company had been guilty of any fraudulent conduct, in consequence of which the Portage Company had been prevented from earning the grant, and the legislature thereby induced to revoke it, and bestow it upon the Omaha Company, the party wronged by those acts of the Omaha Company was entitled to redress. But here, as we have seen, although the charges are the same, yet the testimony fails to make good those charges, or to show any fraudulent or wrongful conduct on the part of the Omaha Company. The legislative act condoned no wrong, for there was no wrong to condone. It neither placed nor continued any burden upon the land grant, and hence the mortgage creditors of the Portage Company, having no lien, legal or equitable, cannot pursue the lands in the hands of the Omaha Company. There is this substantial difference between the Angle Case and the present: While in each are charges of grievous wrong on the part of the Omaha Company, in consequence of which property which otherwise would have been subjected to the payment of the plaintiff's claims was obtained by the Omaha Company, in the Angle Case the Omaha Company demurred, saying there was no remedy, notwithstanding the wrongs alleged. We held that, if such wrongs as were alleged had been committed, the law did furnish a remedy. In this case the Omaha Company took issue upon the charge of having committed such wrongs, and the testimony shows that it did not commit them."

### On the appeal in this case it was said:

"But it must be remembered that the wrongs of the Omaha Company were done before the legislature passed either the act of 1882 or that of 1883, and it is to redress those wrongs that this suit is brought. * * * The wrong was not done by the state, or in the act of the legislature in taking away the land grant, but in such proceedings on the part of the Omaha Company as put the Portage Company in a position which apparently called for the action of the legislature. * * * The property was in the Portage Company for the purpose of aiding in the construction of this road. Work was done by the plaintiff in that direction. Equity recognizes a right that that property should be applied in the payment for that work. The wrongdoing of the defendant, the Omaha Company, has wrested the title to this property from the Portage Company, and transferred it to itself. It has become, therefore, a trustee ex maleficio in respect to the property."

"In considering the evidence in this case," it is said in the last brief for the appellant, "the court can get no light from the opinion in the bond case as to the effect of the fraudulent and criminal lobby contract upon Angle's rights, as to the frauds practiced upon the legislature by means of this lobby contract, or by the false representations and concealments which are charged in the bill, and which are fully proved in this case. Nor can it learn, from the opinion, what interpretation the supreme court put upon the sell-out contract, Exhibit L. Upon these and other points there is new and highly important evidence in this case. And with respect to the one point which they most fully discuss, namely, the question whether the Jackson stock was subject to the trust pro-

vision of the reorganization contracts, we repeat that we shall show, by evidence almost wholly new, that the conclusion which the supreme court arrived at is clearly untenable in the case at bar."

The evidence in this case touching the lobby contract and the sell-out contract, and the uses to which they were put in order to influence the legislature, though fuller, is not essentially different from the corresponding evidence in the trust company case, which counsel have called the "Bond Case"; and we agree with the court below "that, where there is a difference, as in the testimony of Porter, Spooner, and Peck, that difference makes rather in favor of the defendant than the plaintiff." There is certainly nothing to justify a departure from the views of the supreme court.

Upon the question which is most strenuously contested—whether the Jackson stock was subject to a trust which was violated by the transfer to Cable—the new evidence seems to be of little moment. The most that can be said of it is that it tends strongly to show that the entries on the stubs showing an issue of stock to J. C. Barnes were not made at the time they bear date, but at a much later date. An inference that the Barnes stock was not the trust stock may or may not be justified, but either way it does not follow that the Jackson stock must have been under the trust. That inference is not necessary nor admissible. The purpose to create such a trust as that provided for may have been abandoned or modified, or it may have been postponed, and allowed to go by default; but, what is more to the point, and conclusive, to impose upon the Jackson stock the conditions of the alleged trust would be distinctly inconsistent with the contract between Jackson and the railway company, evidenced by his proposition and by the resolution of acceptance, by force of which Jackson became entitled to the immediate issue and unqualified delivery to himself of the stock and bonds specified. The Price resolution, whatever the supposable purpose of its adoption, does not purport to modify, and cannot be deemed to affect, the explicit contract so executed, and in force between the parties when that resolution was adopted. It may well be conceded that the bonds and stock issued to Jackson come within the description of the bonds and stock which, according to the agreements of September 20, 1880, and January 20, 1881, were to be put in special deposit; but Jackson was not, nor were his assignors, party to, or in any way bound by, those contracts. He was therefore at liberty to exact such terms as he chose for the surrender and liquidation of his claims; and, the very explicit terms which he proposed having been accepted as they were, the attempt to import from other writings between other parties, and not referred to in his proposition or in the resolution of acceptance, inconsistent and restrictive conditions, cannot be sanctioned. The claims which Jackson surrendered were long past due, and in lieu thereof he bargained for bonds and stock to be delivered forthwith, and yet, if the position of the appellant is true, both bonds and stock were to be put in special deposit under a trust, one condition of which was that before delivery of any of the bonds, which might not happen for two years or more, past-due interest coupons should be cut off and canceled.

While further consideration of this phase of the case is not necessary, it would seem that, if the alleged trust were conceded, the transfer of the stock to Cable was not a wrong to the appellant's intestate. It is not alleged in the bill that the trust was intended for, or was of a nature to inure to, the advantage of general creditors of the Portage Company, or that Angle, before entering into his contract for the construction of the roadbed, knew of and relied upon the trust, or supposed that it could in any way affect his rights or interests.     Indeed, it is upon its face, a hardly credible proposition that parties planning, as were Gaylord, Schofield, and the investment company, to construct a railroad, and, under the necessity of procuring outside aid, should have put their scheme in such shape at the beginning, when their efforts were necessarily tentative, that no change of plan could be made without the consent of any creditor or contractor to whom meanwhile some liability or obligation should have been incurred.     No such trust could reasonably have been intended, and none such, it is clear upon the face of the contracts, was created.     To those contracts Gaylord, the investment company, and Schofield were the only parties, and, acting in good faith, it was their privilege at any time, notwithstanding the contract of Angle with the railway company, to change or annul their agreements, releasing, if they chose, bonds and stocks already impounded thereunder.     The entire title and beneficial interest in the stock was confessedly in Jackson and Barnes, and, if the trust ever attached, it affected only the possession and control.     In no event was it possible by mere force of the trust that Jackson and Barnes should lose, or that Angle should acquire, an interest in the stock.     He had no interest, as the supreme court has already said; and if, knowing of the proposed transfer, he had sought to obtain an injunction or restraining order, he could have had no standing in court; and it is equally clear that his administratrix may not complain of the assignment or its consequences.

The averment in the bill that the Jackson stock was permitted, "by inadvertence" of the president of the company, to pass into the hands of J. C. Barnes, the vice president, is supported by no evidence. Schofield, the president, signed a formal written order for the delivery of the stock by the trust company to Barnes, and the fair inference is that he did it understandingly, on the ground that by the resolution of the board accepting Jackson's proposition an immediate delivery was obligatory, as the order recites, "without regard to any of the conditions or limitations contained or specified in said orders," according to which stock properly in trust was to be delivered.

It is contended that Jackson had no lien on the stock, but held only under a naked trust for Barnes.     On the entire evidence we deem it clear that he held it as collateral security for the payment of liabilities to himself, Ruger, and Sloan, which Barnes had assumed to pay; and as a result of his relation to Ruger and Sloan he would probably have been answerable to them for the amount of their demands if he had refused or failed to accept payment in the mode proffered.

Many minor points have been discussed, but these considerations, in view of the opinions of the supreme court referred to, are deemed determinative of the case; but, it may be added, we agree with the

judge below "that the final collapse of the Portage Company in the winter of 1882 was not caused by any wrong (if wrong were conceded to have been) committed by Jackson, or J. C. Barnes, or Porter or Cable, or the Omaha Company," but was attributable, as the evidence shows beyond reasonable doubt, to other causes, for which the Omaha Company was in no way responsible.    The decree below is affirmed.

GROSSCUP, Circuit Judge, by reason of sickness, did not share in the final consideration of this case.