BLACK *v.* BOLLINGER.

5-1678                                                      317 S. W. 2d 130

Opinion delivered November 3, 1958.

*Reid & Burge* and *Bernal Seamster,* for appellant.

*Frank C. Douglas,* for appellee.

PAUL WARD, Associate Justice. Appellees raised and sold cotton in 1956 to Manila Gin Company, but were unable to cash the gin's checks given them for the purchase price. They instituted this action against the Gin Company (*i. e.* the two partners owning and operating the Gin), The Corning Bank at which the Gin Company did business, and L. G. Black who was connected with the Bank and also was a creditor of the Gin Com-

pany. There were other defendants originally but they are not material to this opinion.

Since one of appellant's contentions is that the trial court rendered its decision on a question not raised in the pleadings, the material portions of the complaint will be abstracted at length following a statement of the factual background leading up to this litigation. Because of the disposition hereafter made of this case many details will be omitted.

*Background.* Prior to 1952 the Manila Gin Company was owned and operated as a partnership by L. G. Black (appellant) and K. S. Jackson. In May of that year Black sold his interest to Jackson, resulting in Black holding Jackson's notes in the amount of $12,642.50, payable in three installments on December 31, 1953, 1954 and 1955 and secured by a second mortgage on the gin property. Nothing had been paid on these notes when this litigation began on November 21, 1956. Before the ginning season started in 1956 Jackson sold an interest in the Gin to U. S. Griffith. Jackson and Griffith, who were in need of financial aid, were doing business with the First National Bank of Blytheville. Later, on about September 14, 1956, at Black's suggestion, Jackson and Griffith started doing business with The Corning Bank. It seems that it was the policy of the gin company to purchase the cotton which farmers brought to it for ginning. Briefly, the arrangement with The Corning Bank was this: The bank furnished the gin company cash to purchase the cotton; when the gin company made a purchase it would issue its check for the purchase price on the bank, and would then redeem the check with cash; then the gin company would place the cotton in a government warehouse and receive negotiable warehouse receipts, and when the gin company exhausted its cash on hand it would take the redeemed checks to the bank and receive cash to the amount of $100 for each bale of cotton purchased. Apparently the gin company would retain the warehouse receipts or sell them and (presumably) turn the money into the bank. It is apparent that the bank would be required to carry an overdraft

for the gin company since it paid more for the cotton than $100 per bale. On October 6, 1956 Black endorsed Jackson and Griffith's note to the bank for $6,800 whereupon the bank agreed to advance $125 per bale. It seems that the bank's security for the ever increasing overdraft was the warehouse receipts.

Appellees, J. N. Bollinger, W. O. Roach, and Frank Nowlin were farmers in the Manila vicinity and had been customers of the gin company for several years. In the fall of 1956 they sold cotton to the gin company under the arrangement above mentioned, but the gin company was unable to redeem their checks. When these checks were presented to the bank on or about October 16, 1956 payment was refused and they have never been paid. At that time the bank refused to advance any more money to the gin company which (according to the bank statement) owed the bank $19,961.70. On November 3, 1956 the gin company increased its debt or overdraft to the amount of $20,057.70. On December 1, 1956 the bank sold, with the consent of the gin company, warehouse receipts which had been turned over to it and received therefor the sum of $27,390.42. This amount, however was not sufficient to cover the overdraft of $20,057.70 plus the said $6,800 and plus other advances made by Black to help keep the gin in operation. There was of course no money available to take up the checks held by Bollinger, Roach and Nowlin, hence this litigation.

*Pleadings.* The complaint, in all material parts, states in substance:

". . . these plaintiffs have reason to believe that a great number of warehouse receipts for cotton belonging to these plaintiffs, and other customers of said Manila Gin Company, have been placed with The Corning Bank; that such a plan and scheme was for the purpose of fraudulently securing money which the said K. S. Jackson and his partner did not intend to use in paying for the cotton they claimed to have bought, but in order to pay the defendant L. G. Black (Laney Black) . . . ; that it was all done with the fraudulent intent

to hinder, cheat and delay these plaintiffs; that such fraudulent scheme was known to the said defendants who benefited or were to benefit from such fraudulent purchase of said cotton.''

The amended complaint states:

''The defendants K. S. Jackson, Sam Griffith, L. G. Black and The Corning Bank entered into a scheme and plan whereby said K. S. Jackson and Sam Griffith would buy cotton from the customers of the Manila Gin Company, (owned by said K. S. Jackson and Sam Griffith, and under deed of trust to L. G. Black) and would surrender the warehouse receipts for such cotton to The Corning Bank, get a portion of the price of such cotton paid over to said K. S. Jackson and Sam Griffith, and when the cotton was sold would then pay the balance due on such cotton to L. G. Black, knowing all the time that said K. S. Jackson and Sam Griffith did not have sufficient money to fully pay for the cotton they bought, and knowing that some of said cotton was subject to landlord's lien for rent and some was under mortgage to the Planters Production Credit Association.''

''That under this plan and fraudulent scheme, the said bank was not an innocent purchaser of said warehouse receipts and cotton and knowing that said K. S. Jackson and Sam Griffith had not paid the producers and owners of such cotton and did not intend to pay for such cotton . . . That the transaction was not in the usual and ordinary course of a banking institution, was not *bona fide* and without fraud in its inception and accomplishment.''

''These plaintiffs further allege that in making this fraudulent scheme to get money to pay L. G. Black, and for K. S. Jackson and Sam Griffith to use, the bank was fully aware that the cotton covered by the warehouse receipts were not paid for, and that the checks issued by Manila Gin Company on The Corning Bank would not be paid.''

The prayer was for a marshalling of assets, for subrogation, for judgment against Jackson, Griffith, and Black, and for "full and complete relief."

After a lengthy hearing the trial court, among other things found: The Manila Gin Company is indebted to each of the plaintiffs (appellees) in the amount sued for; The Corning Bank dealt at arms length with the parties at all times, and; Black did not enter into an intentional and deliberate conspiracy with Jackson and Griffith to defraud the plaintiffs. The court then said that "The real problem . . . is whether defendant L. G. Black assumed and exercised such control over the finances of the Manila Gin Company during 1956 that he became liable *as a partner* to these plaintiffs." (emphasis supplied.) Following this the court entered a decree against Jackson, Griffith, and Black in favor of Bollinger for $2,681.86, in favor of Roach for $1,073.44, and in favor of Nowlin for $872.66. Also a decree was rendered against all the above in favor of Borowsky Brothers for $97.77. Black is the only one who has appealed.

It is strongly insisted by appellant Black, and we agree, that the court erred in rendering a decree against him on a ground or theory not contained in the pleadings. Those portions of the complaint copied above show plainly, we think, that appellees sought recovery against Black on the sole ground that he had entered into a fraudulent plan or scheme with Jackson, Griffith, and The Corning Bank to use some of the proceeds from the operation of the gin to repay old debts to himself and consequently thereby make it impossible for the plaintiffs to collect their claims. There were no allegations in the complaint to put Black on notice that he was being sued as a partner. Nor was any testimony introduced which would have given him such notice. Without detailing the testimony it suffices to say that such testimony was consistent with the alleged ground of a conspiracy or fraudulent scheme and consequently no notice of a partnership. Therefore the action of the trial court cannot be justified by the well established

rule that the court may treat the pleadings to conform to the testimony. The rule applicable here is clearly stated in 30 C. J. S., Equity, § 403, pp. 820-821:

"After a hearing and submission of the cause, the court is reluctant to permit an amendment, and an amendment will not then be permitted, the effect of which would be materially to change the issues or introduce new issues, unless, at least, an opportunity is given to introduce further proofs."

The above rule has been approved repeatedly by this court. In *Butler* v. *Butler,* 176 Ark. 126 (at page 128), 2 S. W. 2d 63 we said:

"If appellants had desired to raise the issue of the extent of the homestead on account of its value, they should have done so in their complaint, in apt time, so that it could have been met by pleading on behalf of appellees, and by proof. The court did not therefore err in excluding this evidence and in refusing to permit appellants to amend."

In the case under consideration the plaintiffs did not offer to amend the complaint. On the other hand, the court not only rendered its decision on an issue not raised by the pleadings but also refused to allow appellant to introduce further proof on that issue. In *Price* v. *Price,* 215 Ark. 425 (at page 428), 220 S. W. 2d 1021, the court, referring to Kirby's Digest § 6145 which corresponds to Ark. Stats. § 27-1160, approved this statement: "Under statutes like this it has been uniformly held that no amendment can be allowed after the commencement of a trial which introduces into the case a new cause of action." For the error indicated the decree of the trial court must be reversed.

Appellant insists that the cause should not only be reversed but that it should also be dismissed. In support of this appellant says there is no evidence to support the finding of liability on the basis of a partnership, and after a careful examination of the record on this point we are forced to agree. For the reason indi-

cated below we have concluded, however, that the cause should not be dismissed. Since reaching this conclusion it would serve no useful purpose to detail the testimony. Suffice to say there is no testimony that Black was a partner in that he took any part in actually running the gin, or that he in any way led anyone to believe he was doing so. There is no testimony that he induced appellees or anyone else to patronize the gin or induced them to withhold their checks. All Black did, according to the record, amounted to helping Jackson and Griffith finance their gin operation through The Corning Bank, and there is no showing that he received any gin proceeds to apply on any old debts.

We have concluded that, in the interest of justice to appellees, the cause should be remanded for a more detailed accounting of the proceeds of the operation of the gin, if appellees should so desire. We do this because all parties and the trial court seem to think there should have been sufficient funds from the gin operation to pay all claims, because no attempt was made to account for all the proceeds, and because there is nothing to indicate clearly how the credits given to Jackson and Griffith are tied in with the bank overdraft.

This court has heretofore remanded causes in chancery where it appeared that further development was necessary. See: *Langhorst* v. *Rogers*, 88 Ark. 318, 114 S. W. 915, and *Massey* v. *Tyra*, 217 Ark. 970, 234 S. W. 2d 759.

Therefore the cause is reversed for the reason above indicated, and it is remanded for further development along the lines indicated if appellees so desire.

McFADDIN, J., dissents as to reversal and concurs as to the remand.

MILLWEE, J., SMITH, J., and ROBINSON, J., dissent as to remand.

ED. F. McFADDIN, Associate Justice (Dissenting in Part and Concurring in Part). My views in this case are as follows:

(1) I think the prayer of the plaintiffs' complaint was sufficient to support the Court's decree finding Black liable, entirely aside from any proof of conspiracy. Here is that portion of the prayer:

"Plaintiffs pray for judgment to which each may be entitled when the case is heard and as shown by the facts; * * *

"Plaintiffs further pray for the marshalling of assets, for subrogation where any of their cotton or cottonseed have been delivered to any of the defendants, or where warehouse receipts have been pledged or delivered to any of said defendants, * * * and for complete and equitable relief to which the court may find each plaintiff is entitled, and for all costs herein expended."

(2) I think Black was liable to plaintiffs even in the absence of any evidence of conspiracy. Mr. Black admits that while 164 bales of the cotton were still unsold, the plaintiffs came to him and asked if there would be any equity in the 164 bales sufficient to pay their checks. The plaintiffs say (and the Trial Court evidently believed them) that Black told them that when the cotton was sold he would let them know. Bollinger gave Black his telephone number.

Black and his son took the compress receipts on this lot of 164 bales of cotton, had it resampled, sold the cotton without consulting the gin, the bank, the plaintiffs, or anyone else. When the money came back to the bank the total was $27,390.42. The bank paid itself (which it had a right to do) the amount of its claim in excess of $20,000.00. Then occurred the situation which I think makes Black liable. Without notifying the plaintiffs he directed the bank to take from the remaining proceeds of the sale of the cotton enough to pay the $6,800.00 note and interest which he had endorsed for the gin company. He thereby preferred himself as a creditor over these plaintiffs. Mr. Black's handling of the situation did not stop at that point: there was left a balance of $370.39,

and Mr. Black had that amount credited to the Clay County Cotton Company, which was one of his own organizations. There is no showing—nor is there any claim —that the gin company owed the Clay County Cotton Company anything.

Under these facts and others in the record, I think Mr. Black became liable to the plaintiffs as an intermeddler in the affairs of the gin company and that equity should grant the plaintiffs relief against Mr. Black for his intermeddling. In 33 C. J. 269, an intermeddler is defined as, "a person who officiously intrudes into a business to which he has no right; one who enters himself into a situation on his own initiative". In 54 Am. Jur. 188, in discussing intermeddling with property as making the intermeddler a constructive trustee, the rule is stated, "A constructive trust may arise where one wrongfully intermeddles with or assumes the management and control of property of another". To sustain the text there are, among others, the cases of *Garney* v. *Jarvis,* 46 N. Y. 310, 7 Am. Rep. 335; *Bailey* v. *Bailey,* 67 Vt. 494, 32 A. 470, 48 A.S.R. 826; and *Morris* v. *Joseph,* 1 W. Va. 256, 91 Am. Dec. 386. These cases do not present factual situations like the one at bar, but they recognize the broad equitable principle that an intermeddler makes himself liable. There is an annotation in 38 L. Ed. 55 on the liability of a person as a trustee *ex maleficio* from his act of intermeddling. Even though Black was not a partner in the gin company, he certainly intermeddled with its affairs and sold cotton and got a part of the proceeds, in violation of his promise to the plaintiffs that he would notify them when the cotton was sold. Under these facts, I think it is within the broad power of equity to hold Mr. Black liable as a trustee *ex maleficio* for intermeddling. So I would affirm, the Chancery decree against Mr. Black.

(3)  But the other members of the Court vote to reverse the case; and so, in order to allow the plaintiffs an opportunity to try to salvage something against Mr.

Black, I agree that the cause should be remanded for further development.

SAM ROBINSON, Associate Justice, (Dissenting). The appellees tried their case on the theory of fraudulent collusion between the bank, Jackson, Griffith and Black, all of whom were named as defendants, to cheat and defraud the appellees. The alleged fraud was not proved. Of course, Jackson and Griffith were liable on the worthless checks given to appellees, and default judgments were rendered against them. But there was no finding of fraud on the part of Black or the bank, and the decree was in favor of the bank. Black was held to be liable solely on the theory that he was a partner with Jackson and Griffith. The majority opinion points out that there is no testimony that Black was a partner with Jackson and Griffith, and no evidence to the effect that he caused anyone to believe he was such a partner. It is further shown that he did not induce anyone to patronize the gin or induce anyone to withhold their checks. And the opinion states: "All Black did, according to the record, amounted to helping Jackson and Griffith finance their gin operation through the Corning Bank, and there is no showing that he received any gin proceeds to apply on any old debts."

There was no finding of fraud. In fact, the bank, one of the alleged conspirators, has been dismissed from the case, and there is no evidence of Black's being a partner with Griffith and Jackson. Hence, I fail to see how Black could be liable. It is therefore my opinion that the action should be dismissed, and I respectfully dissent from the action of this Court in remanding the case for new trial.

I am authorized to say that Mr. Justice GEORGE ROSE SMITH joins in this dissent.